HYATT CORPORATION, Plaintiff,

v.

Michael V. STANTON, Defendant.

96 Civ. 4934 (MBM).

United States District Court,
S.D. New York.

Nov. 19, 1996.

Deborah Deitsch–Perez, John A. Sopuch, Megyn M. Kelly, Bickel & Brewer, New York City, for Plaintiff.

Fran M. Jacobs, Cecelia L. Fanelli, Michael M. Baylson, Duane Morris Heckscher, New York City, and Philadelphia, PA, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Hyatt Corporation sued Michael Stanton, Senior Vice President of Skopbank, a Finnish Bank owned by the Finnish Government Guarantee Fund ("GGF"), in New York State Supreme Court, New York County, for tortious interference with contract and prospective economic advantage, civil conspiracy, and prima facie tort. The action was removed to this court pursuant to: 1) Section 1441(d) of Title 28, permitting the removal of any action involving a foreign state as defined by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.;* 2) Section 1651 of Title 28, the All Writs Act; and 3) Section 1441(b) of Title 28, federal question jurisdiction. Hyatt now moves to remand this case to state court, arguing that none of these statutes justifies removal. For the reasons given below, Hyatt's motion is granted.

I.

For the purposes of this motion, non-jurisdictional facts alleged in the complaint are accepted as true. Jurisdictional facts are drawn from the complaint, affidavits and exhibits submitted by the parties. *Kline v. Kaneko,* 685 F.Supp. 386, 389–90 (S.D.N.Y. 1988). Defendant Stanton, a resident of New York, is a Senior Vice President of Skopbank. Skopbank is a savings institution, incorporated and headquartered in Finland, with an office in New York City. (Compl. ¶¶ 4, 5) Plaintiff Hyatt Corporation is a Delaware corporation with its principal place of business in Chicago.

On September 19, 1991, the Bank of Finland took control of Skopbank, assuming ownership of 52.9% of its total stock and 63.59% of its voting stock. (Notice of Removal, Ex. B at 5; Vaisanen Aff. ¶ 5) The Bank of Finland is the "national central bank" of Finland and is under the control of the Finnish Parliament. (Notice of Removal, Ex. B at 5) It owned its shares in Skopbank through a wholly-owned subsidiary, Scopulus Oy. (*Id.*)

On June 15, 1992, Finland's Government Guarantee Fund ("GGF") purchased all of Scopulus Oy's shares in Skopbank. (*Id.* at 6; Vaisanen Aff. ¶ 6) The GGF was created by the Finnish Parliament. Its "mission ... is to safeguard the activities of [Finnish] deposit banks and the claims of depositors. The GGF has been provided with extensive powers to grant bank support and deal with the bank crisis in Finland." (Vaisanen Aff. ¶¶ 8–9) Skopbank is currently controlled by GGF, which owns 52.9% of its total stock and 62.59% of its voting stock.

This lawsuit concerns a defaulted loan to a resort on the Caribbean island of St. John. In June 1988, Skopbank loaned approximately $100 million to Great Cruz Bay Development Co. to facilitate the development of a resort hotel and condominium project on St. John to be named Virgin Grand Beach Hotel–St. John. (Compl. ¶ 7) The resort project was not an immediate success and, in July 1989, Great Cruz missed its interest payment on the loans. (*Id.* ¶¶ 9, 10) Instead of foreclosing, Skopbank decided to restructure the loan. As a condition of the restruc-

turing, Skopbank insisted that the managers of the hotel be replaced, preferably by the Hyatt Corporation. (*Id.* ¶¶ 10–12)

After extensive negotiations, Hyatt agreed to manage the resort and on March 9, 1990, entered a Management Agreement with Great Cruz. (*Id.* ¶ 18) Great Cruz agreed to fund improvements in the hotel's physical plant and to give Hyatt a share of hotel profits. (*Id.* ¶¶ 16, 17) The Agreement had a term of 30 years and included a provision that bound Great Cruz's successors-in-interest to the Agreement's obligations. (*Id.* ¶ 16) The Agreement could be terminated if certain defaults occurred; Hyatt contends that no default, as defined by the Agreement, has occurred. (*Id.* ¶¶ 26–27) Skopbank guaranteed the renovation which Great Cruz had promised. (*Id.*) Skopbank also agreed, in a document entitled "Subordination, Non–Disturbance and Attornment Agreement," that a foreclosure on the property would not impact Hyatt's rights under the Management Agreement. (*Id.* ¶¶ 20–21)

In 1991, Skopbank initiated foreclosure proceedings against Great Cruz. (*Id.* ¶ 31) On February 17, 1995, a Consent Judgment in Foreclosure was filed. Pursuant to this Consent Judgment, a $71 million cash-flow note held by Skopbank was converted to a judgment lien on the hotel. (*Id.* ¶ 34) On March 1, 1995, Skopbank and GGF wrote Hyatt stating that "the Management Agreement ... [is] not binding on GGF, Skopbank or their successors, nominees and assigns." (*Id.* ¶ 35)

The resort was sold at auction by the United States Marshal's Office on March 20, 1995. An entity named 35 Acres Associates purchased title to the hotel part of the resort. (*Id.* ¶ 36) Hyatt alleges that 35 Acres is a general partnership consisting of two corporate partners, Oy Intersio Ab and Ultraponi Oy, which it asserts are wholly owned by Skopbank and directed by Stanton. (*Id.* ¶ 37) Defendant presents the testimony of a GGF official, who states that Stanton is not a director of, and has no control over, 35 Acres. (Vaisanen Aff. ¶¶ 21, 24, 25)

On March 21, 1995, after acquiring title to the hotel, 35 Acres terminated the Management Agreement with Hyatt. (Compl. ¶ 39)

On June 8, 1995, 35 Acres demanded that Hyatt surrender possession of the hotel. (*Id.* ¶ 40)

In its complaint, Hyatt alleges that Stanton directed the foreclosure, sale, and subsequent termination of the Management Agreement in an attempt to appropriate for Skopbank the premiums and goodwill from the resort's success. Hyatt alleges that Stanton acted for his own personal benefit and beyond the scope of his authority in directing these actions. It alleges that this conduct benefitted him by "broadening his own responsibilities and thereby enhancing his future employment possibilities and economic opportunities." (*Id.* ¶ 31) Stanton has submitted the affidavit of Jarmo Vaisanen, the Financial Counsellor of the Ministry of Finance of Finland. He attests that Stanton acted in his official capacity as loan officer and within the scope of his authority in his actions in relation to the resort. (Vaisanen Aff. ¶¶ 17, 20, 21, 26–29) He also states that Stanton received no personal benefit from these actions. (*Id.* ¶¶ 26–29)

On May 29, 1996, Hyatt filed a complaint against Stanton in New York State Supreme Court, New York County, asserting three causes of action, including tortious interference with contractual relationship and prospective economic advantage, prima facie tort, and civil conspiracy.

Stanton filed a Notice of Removal on June 28, 1996. The Notice asserts three grounds for removal. First, it relies on 28 U.S.C. § 1441(d), arguing that Skopbank is a foreign state under the definition given in 28 U.S.C. § 1603, and Stanton was acting in his official capacity on Skopbank's behalf. Second, it claims that removal is proper under the All Writs Act, 28 U.S.C. § 1651, in order to prevent the frustration of and collateral attack upon orders previously issued by the District Court of the Virgin Islands. Third, defendant cites 28 U.S.C. § 1441(b), arguing that plaintiff's claims raise questions of federal law "since the Finnish Government has substantial interests in regulating its banking system, including the collection of loans." (Notice of Removal ¶ 10)

## II.

Two other federal actions, one pending and one dismissed, are relevant to this motion. An action styled *GGF v. Hyatt Corp.*, Civ.Action No. 1995-49-M (D.V.I. filed March 16, 1995), is currently pending in the United States District Court of the Virgin Islands. The plaintiffs in that action are GGF, Skopbank, 35 Acres Associates, 12 Acres Associates and Benefori Oy. They assert various claims against Hyatt based on its alleged breach of the March 1990 Management Agreement, including failure to make debt service payments to Skopbank. Hyatt's motion to dismiss that complaint was denied on April 10, 1996. (Notice of Removal, Ex. F) Hyatt recently filed a Second Amended Counterclaim in that case against 35 Acres, Skopbank and GGF. In its counterclaim, Hyatt asserts breach of contract against Skopbank and 35 Acres, tortious interference against Skopbank and GGF, conspiracy against Skopbank and GGF, equitable estoppel against Skopbank, unjust enrichment against Skopbank and GGF, breach of warranty against 35 Acres, fraud against Skopbank, breach of guaranty by Skopbank, fraudulent conveyance against Skopbank and 35 Acres, and prima facie tort against all defendants. (Biester Aff., Ex. B) .

Another action, styled *Hyatt Corp. v. 35 Acres Associates*, Civ.Action No. 1995-68 (D.V.I.), was filed in the District Court of the Virgin Islands on April 25, 1995, after 35 Acres terminated Hyatt's Management Agreement. Hyatt sought a declaratory judgment that its Management Agreement was enforceable and not terminated. It also alleged that 35 Acres had engaged in a civil conspiracy to deprive Hyatt of its rights under the Agreement. In January, 1996, Judge Thomas K. Moore dismissed that action, finding that the Management Agreement had created an agency that was revocable at will, and that Hyatt could not prove a civil conspiracy because it had alleged no unlawful acts by the defendant. In the same ruling, Judge Moore granted 35 Acres' motion for summary judgment in *GGF v. Hyatt Corp.*, the case currently pending in the Virgin Islands, finding that Hyatt's agency was revocable at will and the Agreement had been terminated. This decision was affirmed by the Third Circuit at 95 F.3d 291 (3d Cir. 1996). (Notice of Removal, Ex. F)

The plaintiffs in *GGF v. Hyatt Corp.* have moved in the District Court for the Virgin Islands to enjoin this action. They claim that the contentions in the present complaint are the same as those in the dismissed complaint in *Hyatt Corp. v. 35 Acres* and in the Second Amended Counterclaim Hyatt recently filed in *GGF v. Hyatt Corp.*.

## III.

"In light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments, federal courts construe the removal statute narrowly, resolving any doubts against removability." *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir.1994); *see also Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir.1990), *cert. denied*, 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991). In deciding whether removal is appropriate, "the district judge may resolve disputed jurisdictional fact issues ... and may rely on affidavits as well as the pleadings." *Kline v. Kaneko*, 685 F.Supp. 386, 389-90 (S.D.N.Y.1988).

Section 1441(d) of Title 28 provides:

> Any civil action brought in a State court against a foreign state as defined in § 1603(a) ... may be removed by the foreign state to the district court of the United States for the district ... embracing the place where such action is pending.

28 U.S.C. § 1441(d) (1994). Stanton argues that he qualifies as a foreign state under the FSIA's definition of that term and therefore this case may be removed to federal court. In order to qualify as a foreign state under the FSIA, Stanton must show that: a) his employer, Skopbank, is a foreign state; and b) he was acting in his official capacity and within the scope of his authority when he undertook the acts which are the subject of this lawsuit. *See Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990). Because Stanton fails to make the first showing, I need not address the second.

Hyatt's first contention in support of remanding this action is that Skopbank does not qualify as a foreign state, as that term is defined under the FSIA. Hyatt argues that because Skopbank is owned by GGF, which Hyatt claims is an "agency or instrumentality of a foreign state," Skopbank itself cannot be an "agency or instrumentality of a foreign state." The FSIA defines foreign state to include an agency or instrumentality of a foreign state and therefore GGF would be considered a foreign state. However, Hyatt argues that FSIA coverage does not extend to Skopbank because only a corporation a majority of whose shares are owned by a *foreign state* or a *political subdivision* of a foreign state—and not by an *agency or instrumentality* of a foreign state—falls within the definition of agency or instrumentality of a foreign state under the FSIA. Therefore, plaintiff claims that Stanton's employer, Skopbank, does not qualify as an agency or instrumentality of a foreign state and, accordingly, is not a foreign state as that term is defined in the FSIA. Because there is no foreign state involved in this action, plaintiff argues, it must be remanded to state court.

Section 1603 defines the term "foreign state" as used in the FSIA:

(a) A "foreign state", except as used in section 1608 of his title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

28 U.S.C. § 1603(a) (1994). The statute then defines the term "agency or instrumentality of a foreign state":

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor

created under the laws of any third country.

28 U.S.C. § 1603(b) (1994).

The second prong of this test is the focus of the parties' dispute. Hyatt argues that Congress, in defining an agency or instrumentality as an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," specifically excluded from this definition entities a majority of whose shares are owned by an agency or instrumentality of a foreign state. Stanton, on the other hand, claims that the term "foreign state" in § 1603(b)(2) includes an agency or instrumentality of a foreign state, and therefore that a corporation majority-owned by an agency or instrumentality is also itself an agency or instrumentality.

Before reaching this issue of statutory interpretation, I must resolve a threshold issue: whether the GGF is a political subdivision or an agency or instrumentality of the Finnish Government. If GGF is a political subdivision, then Skopbank would fall squarely within the statutory definition of agency or instrumentality of a foreign government: it would be a corporation a majority of whose shares are owned by a political subdivision of a foreign state, and therefore a foreign state under the FSIA. If GGF is an agency or instrumentality of a foreign state, then I must decide whether a corporation like Skopbank, a majority of whose shares are owned by an agency or instrumentality, fits within the definition of agency or instrumentality provided in § 1603(b)(2).

### A. GGF: Political Subdivision, or Agency or Instrumentality?

#### 1. Service of Process on FSIA Defendants

The distinction between political subdivision and agency and instrumentality has been explored in relation to 28 U.S.C. § 1608, which imposes different requirements for serving process on each. For a political subdivision of a foreign state, absent special agreement between the parties, service is proper only if it is made in accordance with an applicable international convention,

or if process is sent by mail, return receipt requested, by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned. Service by clerk of the court must include a foreign translation of each document into official language of the foreign state. 28 U.S.C. § 1608(a) (1994). For an agency or instrumentality of a foreign state, service is proper if made in accordance with a special arrangement between the parties, or in accordance with the applicable international convention, or by delivery of a copy of summons and complaint to an officer of the agency, or a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States. 28 U.S.C. § 1608(b) (1994).

Several courts, in the course of determining whether service of process on a defendant was proper, have addressed the distinction between political subdivision and agency or instrumentality. Those courts have defined agency or instrumentality through reference to § 1603(b). In most cases, the entity at issue met the last two of the three requirements for an agency or instrumentality under § 1603(b)—that the entity be an organ of a foreign state or political subdivision or that it be a corporation a majority of whose shares are owned by the foreign state or political subdivision thereof, and that it not be a United States citizen or a citizen of a third country. Thus, these courts viewed the distinction between a political subdivision and an agency or instrumentality as turning on whether the entity met the first requirement for an agency or instrumentality under § 1603(b): that it be a separate legal person. Here, the GGF is an organ of the Finnish state and is not a citizen of the United States or a third country. Thus, here as well, the critical issue is whether the GGF is a separate legal person.

Courts interpreting the term "separate legal person" have referred to the legislative history. The House Report addressed the "separate legal person" requirement:

> The first criterion, that the entity be a separate legal person, is intended to include a corporation, association, foundation, or any other entity which, under the

law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name.

H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. (1976), *reprinted in*, 1976 U.S.C.C.A.N. 6604, 6614. The Report also gives examples of agencies or instrumentalities:

> [E]ntities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

*Id.*

Courts have disagreed on the test for determining whether an entity is a separate legal person. One group of cases has applied a "core function" test—*i.e.*, an entity is a political subdivision if its central role is governmental in nature, but it is an agency or instrumentality if its central role is commercial in nature. *See Transaero v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995); *Segni v. Commercial Office of Spain*, 650 F.Supp. 1040, 1041 (N.D.Ill.1986). Other courts have applied a "legal characteristics" test—*i.e.*, an entity is an agency or instrumentality if, under the law of the foreign state where it was created, the entity can sue and be sued in its own name, contract in its own name, or hold property in its own name. *See Bowers v. Transportes Navieros Ecuadorianos (Transnave)*, 719 F.Supp. 166, 170 (S.D.N.Y. 1989); *Unidyne Corp. v. Aerolineas Argentinas*, 590 F.Supp. 398, 400 (E.D.Va.1984).

The only circuit court to address this issue has applied a "categorical," "core function" test for determining whether an entity is an agency or instrumentality or political subdivision. In *Transaero*, the D.C.Circuit adopted a categorical approach to determining whether an entity is a political subdivision: "whether the core functions of the foreign entity are predominantly governmental or commercial." 30 F.3d at 151. The Court gave four reasons

for adopting the "core function" test. First, the Court thought it appropriate to apply to the distinction between political subdivision and agency or instrumentality, the FSIA's general approach of preserving immunity for governmental rather than commercial acts. *Id.* at 151–52. Second, the Court noted that under 28 U.S.C. § 1391(f), the District Court for the District of Columbia is the sole venue for suits against a foreign state and its political subdivisions. However, suits against an agency or instrumentality may be heard "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business." 28 U.S.C. § 1391(f) (1994). The Court reasoned that defining agencies and instrumentalities as commercial entities was the only way to make coherent this section's reference to "doing business." Third, the Court found that the House Report was "at odds with itself" because it gives specific examples of entities as agencies or instrumentalities which may or may not have the characteristics of separate legal existence that the Report seems to suggest. Thus, the Court rejected these characteristics as providing the proper test. Finally, the Court reasoned that its categorical approach eliminates uncertainty regarding the proper method of service. *Transaero,* 30 F.3d at 152.

Applying the "core function" test, the Court held that the Bolivian Air Force was a political subdivision. The Court stated that "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id.* at 153.

Judge Mikva dissented, arguing that the majority's reasoning ignored the clear language of the statute and legislative history. He wrote that the statute's use of the words "separate legal person" did not support the majority's distinction between commercial and governmental. Further, he found the statute's exclusion of commercial activities from immunity did not mandate that agency and instrumentality include only a commercial entity, and that political subdivision include only a governmental entity. Judge

Mikva noted that the venue provision quoted by the majority was not the exclusive venue provision for suit under the FSIA. Rather, the statute also permits suit against agencies or instrumentalities, or any other foreign entity, "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(f)(1) (1994). Thus, the venue provision, when viewed in its entirety, does not dictate that agencies must always be commercial entities. Rather, he reasoned, its reference to places of doing business with respect to agencies or instrumentalities is merely a recognition that many such entities are commercial. Finally, Judge Mikva found that the House Report was not at odds with itself, even though many of its examples of agencies or instrumentalities are commercial entities that may not have the characteristics the Report seems to require for agencies or instrumentalities. Rather, Congress was merely giving some specific examples of the types of companies that might be agencies or instrumentalities, not dictating that all such entities would be agencies or instrumentalities.

Other courts have applied a "legal characteristics" test to distinguish between political subdivisions and agencies or instrumentalities. Under this test, an entity is considered a separate legal person if, under the laws of the state in which it is established, it has the ability to own property, contract, and be sued in its own name. *See Bowers v. Transportes Navieros Ecuadorianos (Transnave),* 719 F.Supp. 166 (S.D.N.Y.1989); *Unidyne Corp. v. Aerolineas Argentinas,* 590 F.Supp. 398 (E.D.Va.1984).

For example, in *Bowers,* the entity at issue was an organization created by presidential decree to "effect state goals concerning the strengthening of the National Merchant Marine by engaging in commercial maritime and coastal waterway transport, as well as engaging the active participation of Ecuador in worldwide navigation activities." 719 F.Supp. at 170. The Court found several characteristics of the entity that indicated it was a separate legal person from the Ecuadorian government, including: a) the entity

had its own assets; b) it could establish branches in foreign territories and join other associations or organizations; c) it had its own budget from which it paid employees' salaries; and d) it conducted business in its own name and contracted in its own name. *Id.*

Other cases applying the "legal characteristics" test have found entities such as a country's permanent mission to the United Nations and a country's naval commission to be political subdivisions because these entities were closely connected to the government and lacked the legal characteristics of a separate entity. *See Unidyne Corp.,* 590 F.Supp. at 400 (Argentine Naval Commission); *Gray v. Permanent Mission of the People's Republic of Congo to the United Nations,* 443 F.Supp. 816, 820 (S.D.N.Y.) ("It is hard to imagine a purer embodiment of a foreign state than the state's permanent mission to the United Nations."), *aff'd,* 580 F.2d 1044 (2d Cir.1978).

Before determining which test to apply, I must address a Second Circuit case that may bear on how to distinguish between a political subdivision and an agency or instrumentality.

### 2. *O'Connell Machinery Co.*

In *O'Connell Machinery Co. v. M.V. 'Americana',* 734 F.2d 115 (2d Cir.), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984), a defendant, an Italian corporation named Italia Di Navigazione d/b/a Italian Line, moved under the FSIA to dismiss the action, arguing that it was a foreign state immune under the Act. A majority of shares of Italian Line were owned by Societa' Finanziaria Marittima (FINMARE). FINMARE, in turn, was under the "direct control of the Istituto per la Ricostruzione Industriale ["IRI"], a public financial entity which coordinates the management of the commercial enterprises of the Italian Government." *Id.* at 116. The District Court noted that the IRI's annual budget and plans were approved by a member of the Italian Cabinet and ultimately submitted to the Parliament. *O'Connell Machinery Co., Inc. v. M.V. 'Americana',* 566 F.Supp. 1381, 1384 (S.D.N.Y.1983), *aff'd,* 734 F.2d 115

(2d Cir.), *cert. denied,* 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984).

The Second Circuit concluded that Italian Line qualified as an agency or instrumentality of Italy and therefore was entitled to FSIA protection. The Court stated,

> The fact that the Italian Government saw fit to double-tier its administrative agencies did not compel a holding to the contrary. According to the legislative history of the FSIA, political subdivisions were intended to include 'all governmental units beneath the central government.' ... FINMARE fits comfortably within this definition. Moreover, the House Report indicates that 'entities' which meet the definition of an agency or instrumentality of a foreign state could assume a variety of forms, including ... a transport organization such as a shipping line....

*O'Connell,* 734 F.2d at 116–17 (citations omitted). Thus, the court found that FINMARE was a political subdivision, and because a majority of Italian Line was owned by a political subdivision, Italian Line was an agency or instrumentality of a foreign state under § 1603(b)(2).

*O'Connell* may affect the definition of political subdivision. The *O'Connell* Court found that IRI, which it described as "a public financial entity which coordinates the management of the commercial enterprises of the Italian Government," *id.* at 116, was a political subdivision. It reached this conclusion with the help of the House Report, which states that political subdivisions are "all governmental units beneath the central government." Defendant therefore argues that under *O'Connell,* the GGF is a political subdivision because it "is a governmental institution of the Republic of Finland under the control of the Finnish Parliament." (Def.Mem. at 11–12) There is, therefore, some question as to the proper test for determining whether an entity is a political subdivision or an agency or instrumentality.

### 3. *The Proper Test*

■ I believe that the proper test for determining whether an entity is an agency or instrumentality or a political subdivision is the "legal characteristics" test. This test

most closely approximates Congress's intent, as indicated by both the text and the legislative history of the statute.

The statute provides that one of the characteristics of an agency or instrumentality is that it is a "separate legal person." 28 U.S.C. § 1603(b)(1). The plain meaning of this phrase is an entity that can function legally independent of the state. The legislative history confirms that this plain meaning applies here as well. The House Report specifically states that a "separate legal person" was "intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." 1976 U.S.C.C.A.N. at 6614.

In addition, the House Report includes among the examples of an agency or instrumentality a "department or ministry which acts and is suable in its own name." *Id.* The House Report also defines political subdivisions as "all governmental units beneath the central government," a facially broad definition. *Id.* at 6613. However, in order to harmonize these two statements, political subdivisions should be read to refer to all governmental units that cannot act and are not suable in their own name, while agencies or instrumentalities would denote governmental units which act and are suable in their own name. Thus, the text and legislative history point to the "legal characteristics" test.

I do not believe that *O'Connell* requires a different test. Although *O'Connell* could be read to mean that the term political subdivision includes all governmental units beneath the central government, other courts, including some in this district, that have addressed the distinction between agency and political subdivision have failed even to mention the case. *See, e.g., Transaero, Inc.,* 30 F.3d 148; *Bowers,* 719 F.Supp. 166. This suggests that *O'Connell*'s holding is limited to its facts and should not be applied more broadly. In addition, the *O'Connell* Court may have relied on features of the IRI and FINMARE not explicitly set forth in the opinion which led it to conclude that these entities were political

subdivisions under the "legal characteristics" test. For example, the *O'Connell* Court did not discuss whether the IRI or FINMARE were capable of owning property, being sued or contracting in their own name. Finally, the text of the statute and its legislative history indicate a narrower interpretation of "political subdivision" than simply all governmental units beneath the central government. Thus, *O'Connell* does not control the disposition of this case.

Finally, I respectfully decline to follow the D.C.Circuit's "core function" test. That test departs from the text of the statute: the FSIA does not distinguish between commercial and non-commercial separate legal persons in defining agencies or instrumentalities. The legislative history also does not suggest such a distinction, but rather gives both commercial and non-commercial examples of agencies or instrumentalities. Further, that the statute confers immunity only on governmental rather than on commercial acts through the commercial activity exception suggests: a) that it is not necessary to accomplish the statute's ultimate purpose for courts to draw such a distinction in differentiating between political subdivisions and agencies and instrumentalities; and b) that Congress would have explicitly drawn that distinction if it had so intended.

### 4. *GGF's Relationship to Finland and the "Legal Characteristics" Test*

■ GGF officials have characterized the GGF's relationship with the government of Finland in different ways. (*See, e.g.,* Vaisanen Aff. ¶ 3 ("GGF is a governmental institution of the Republic of Finland"); Koponen Decl. ¶¶ 1, 3 (referring to GGF as a "Finnish governmental agency")) However, I need not rely on these characterizations in order to determine whether the GGF is an agency or instrumentality or a political subdivision of Finland because I have available a declaration by Heikki Koponen, Legal Counsel to the GGF, submitted on January 7, 1994 in connection with another case, *Williams v. Union Mortgage Co.,* S.J.C. No. 06410, while that case was pending before the Massachusetts Supreme Judicial Court. The declaration discusses in great detail the GGF's ori-

gins, organization and functions, and attaches as exhibits the translation of the original Finnish Parliamentary Act establishing the GGF and its 1993 Amendment.

The GGF was established by an Act of the Finnish Parliament on April 30, 1992. Its "mission ... is to safeguard the activities of deposit banks and the claims of depositors. The GGF has been provided with extensive powers to grant bank support and deal with the bank crisis in Finland." (Vaisanen Aff. ¶¶ 8–9; Koponen Decl. ¶ 4)

The GGF's management structure includes: a supervisory board, consisting of members of the Parliamentary Supervisory Board; a Board of Management of five members, one a representative of the Ministry of Finance and two appointed by the Financial Supervision Authority; a manager appointed by the Council of State (the Finnish Cabinet); and other staff appointed by Board of Management. (Koponen Decl. ¶ 5) The Finnish Parliament sets aside in the state budget the funds necessary for the GGF's bank support activities. (*Id.*, Ex. A at 4)

The GGF is authorized by statute to subscribe to shares and holdings of member banks and to guarantee loans raised by those banks. (Koponen Decl., Ex. A at 5) The GGF may directly own shares in the banks. (Koponen Decl. ¶ 7) The GGF is permitted also, pursuant to a 1993 amendment to the original act, to own shares in and/or administer asset management companies, *i.e.*, companies created to remove risky and low-yielding balance sheet items from the ownership of the banks the GGF supports. The Finnish Council of State must approve the transfer of a bank's troubled assets to a GGF-owned asset management company. (Koponen Decl., Ex. A at 1) The GGF may also own shares in and/or administer other companies, if such ownership is considered necessary to safeguard the operations of Finnish banks and the stability of financial markets. (*Id.*)

The GGF is an agency or instrumentality of Finland under the "legal characteristics" test. Under Finnish law, it is a separate legal person: the GGF can sue and be sued, own property, and contract, all in its own name. The statute establishing the GGF itself provides that "[t]he Fund may acquire

rights, make commitments and be an interested party in a court of law or in proceedings involving an authority." (Decl., Ex. B at 8) Further, the GGF may own shares in deposit banks and asset management companies. Although the Finnish government exercises some control over the GGF through its management structure and budget, the GGF functions as a separate legal person. Thus, the GGF is an agency or instrumentality of a foreign state and not a political subdivision.

**B.** *Majority Ownership by an Agency or Instrumentality of a Foreign State*

Whether a corporation—here, Skopbank—a majority of whose shares are owned by an agency or instrumentality can be an agency or instrumentality itself is a question that cannot be answered solely by reference to the text of the statute. Subsections (a) and (b) of § 1603 stand in apparent contradiction. Subsection (a) defines foreign state, when used in the remainder of the statute, with the exception of § 1608, to include both political subdivisions and agencies or instrumentalities of a foreign state. Thus, wherever the statute uses the phrase foreign state, it must be read to include both political subdivisions and agencies or instrumentalities.

However, such a reading renders the words "political subdivision" in subsection (b) superfluous. In subsection (b)(2), an agency or instrumentality is defined, *inter alia*, as "any entity ... a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." If foreign state should be read to include both political subdivisions and agencies or instrumentalities, the inclusion of "or political subdivision thereof" in subsection (b)(2) is unnecessary; a "political subdivision thereof" would already be included in the definition by the phrase "foreign state." The inclusion of the phrase "political subdivision thereof" could, therefore, be interpreted to exclude from the definition of "agency or instrumentality" corporations a majority of whose shares are owned by an entity that is itself an agency or instrumentality of a foreign state, but not a foreign state or political subdivision thereof. However, such an inter-

pretation would contradict the definition of "foreign state" in subsection (a), which includes an agency or instrumentality of a foreign state.

The House Report is of no help in resolving this conflict. It merely uses the same terms as the statute and, in the process, includes also the term "political subdivision" and omits the term "agency or instrumentality" in its discussion of majority-owned corporations, which reads:

> The second criterion requires that the entity be either an organ of a foreign state (or a foreign state's political subdivision), or that a majority of the entity's shares or other ownership interest be owned by a foreign state (or by a foreign state's political subdivision). If such entities are entirely owned by a foreign state, they would of course included within the definition. Where ownership is divided between a foreign state and private interests, the entity will be deemed to be an agency or instrumentality of a foreign state only if a majority of the ownership interests (shares of stock or otherwise) is owned by a foreign state or by a foreign state's political subdivision.

H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. (1976), *reprinted in,* 1976 U.S.C.C.A.N. 6604, 6614. The Senate Report is identical. S.Rep. No. 94–1310, at 14–15 (1976).

The Second Circuit has not addressed this issue. Defendants argue that the *O'Connell* Court held that FINMARE was an agency or instrumentality of a foreign state, rather than a political subdivision, and that FINMARE's ownership of a majority interest in Italian Line qualified Italian Line as an agency or instrumentality of a foreign state. Although there is some support for this interpretation, *see, e.g., Talbot v. Saipem A.G.,* 835 F.Supp. 352, 353 & n. 2 (S.D.Tex.1993); *Rutkowski v. Occidental Chem. Corp.,* No. 83 C 2339, 1988 WL 107342, at *1 (N.D.Ill. Oct. 5, 1988); *Great American Boat Co. v. Alsthom Atlantic, Inc.,* Nos. 84–0105, 84–5442, 1987 WL 4766, at *3 (E.D.La. April 8, 1987), *O'Connell* is better read to hold that FINMARE was a political subdivision and therefore Italian Line, a majority of whose shares were owned by a political subdivision, was an

agency or instrumentality of a foreign state. First, a close analysis of the Court's reasoning supports such a reading. The Court quoted the House Report's definition of political subdivision and then stated that FINMARE fit within it. *O'Connell,* 734 F.2d at 116–17. Its previous reference to FINMARE and IRI as administrative agencies was not a classification of these entities as agencies or instrumentalities under the statute's definition, but rather a general description of their role in the government. *Id.* at 116. Finally, the last line of the paragraph—describing examples of agencies and instrumentalities given in the House Report—referred to Italian Line and not to FINMARE. *Id.* at 117. Thus, the text of the opinion is consistent when read narrowly. Second, the *O'Connell* Court did not analyze the textual problems raised by a broader holding, thereby implying that its holding did not raise these interpretive difficulties. Third, other circuit courts that have addressed the issue of whether a corporation a majority of whose shares are owned by an agency or instrumentality is a foreign state under the FSIA did not cite *O'Connell.* Surely these courts, faced with a split of authority in the circuits, would have mentioned the case if it addressed this issue. *See In re Air Crash Disaster Near Roselawn, Indiana on Oct. 31, 1994,* 96 F.3d 932 (7th Cir.1996); *Gates v. Victor Fine Foods,* 54 F.3d 1457 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995).

Other circuit courts are split on the proper interpretation of the statute. In *Gates v. Victor Fine Foods,* 54 F.3d 1457 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995), the Court held that a corporation a majority of whose shares are owned by an agency or instrumentality of a state, rather than by the state itself or a political subdivision of the state, was not an agency or instrumentality of a foreign state under the FSIA. First, the Court dismissed any inconsistency with subsection (a)'s definition of foreign state, explaining that "the statute provides that a foreign state includes an agency or instrumentality, not that it is an agency or instrumentality or that it is defined as an agency or instrumentality." *Id.*

at 1462. Having distinguished between "is" or "defined as", and "includes", the Court was free to interpret the inclusion in subsection (b) of the words "political subdivision" and the exclusion of the words "agency or instrumentality" to mean that a corporation majority-owned by an agency or instrumentality was not itself an agency or instrumentality. *Id.* at 1462. Likewise, *Federal Insur. Co. v. Richard I. Rubin & Co., Inc.,* 12 F.3d 1270 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2101, 128 L.Ed.2d 663 (1994), included the following footnote attributed to Judge Greenberg but not to the other members of the panel:

> a reasonable inference can be drawn that the term 'political subdivision' must have been used in section 1603(b)(2) because 'foreign state' in that section did not include a 'political subdivision thereof.' Otherwise, the term 'political subdivision' in section 1603(b)(2) is superfluous. Furthermore, it can be argued reasonably that Congress by the inclusion of 'political subdivision' and omission of 'agency or instrumentality' in section 1603(b)(2) intended to distinguish between these types of entities, the inference being that the former but not the latter could own an entity which could be regarded as an agency or instrumentality of a foreign state.

*Id.* at 1285 n. 12; *see also Martinez v. Dow Chemical Co.,* Nos. 95–3212, 95–3214, 1996 WL 502461, at *2 (E.D.La. Sept. 4, 1996).

In *Gates,* the Ninth Circuit also reasoned that if immunity were extended to entities a majority of whose shares are owned by an agency or instrumentality, the number of potentially immune entities would vastly increase. The Court noted that a broad interpretation of agency or instrumentality "would provide potential immunity for every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision." *Gates,* 54 F.3d at 1462.

One court in this District has followed the Ninth Circuit's lead in denying FSIA coverage to companies majority-owned by a foreign state's agency or instrumentality. In *Gardiner Stone Hunter Int'l v. Iberia Lineas Aereas de Espana, S.A.,* 896 F.Supp. 125 (S.D.N.Y.1995), the Court held that defendant Aerolineas Argentinas, S.A. ("AA"), did not qualify as a foreign state under the FSIA. Eighty-five percent of AA was owned by Iberia Lineas Aereas de Espana, S.A., a state-owned Spanish airline corporation. *Id.* at 127. Finding the "interpretation of the Act and its legislative history set forth by the Court of Appeals for the Ninth Circuit in *Gates* ... straightforward and persuasive," the Court held that Iberia, an airline company, was an agency or instrumentality of Spain, and therefore AA, a majority of which was owned by Iberia, was not an agency or instrumentality under § 1603(b)(2).

The Seventh Circuit took the opposite view. In *In re Air Crash Disaster Near Roselawn, Indiana on Oct. 31, 1994,* 96 F.3d 932 (7th Cir.1996), the Court reasoned that Congress intended to reach broadly in its definition of foreign state, and therefore intended the term "agency or instrumentality" to be broadly interpreted. Thus, the Seventh Circuit reasoned that subsection (a)'s definition of foreign state—*i.e.,* foreign state "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)"— dictates that where the statute defines an agency or instrumentality as a corporation a majority of whose shares are owned by a foreign state, it includes within the term "foreign state" both political subdivisions and agencies and instrumentalities. *Id.* at 940. To demonstrate that subsection (a)'s definition of foreign state applies even in subsection (b), the Court cited the House Report, which states, "Subsection (a) defines the term foreign state as used in all provisions of chapter 97 ... except section 1608. In section 1608, the term 'foreign state' refers only to the sovereign state itself." *Id.* (citation omitted).

The Seventh Circuit also addressed the argument that its interpretation renders superfluous the words "political subdivision" in § 1603(b)(2). It noted that the House Report gave examples of agencies or instrumentalities that seem to include entities that would be excluded were the statute to be

read narrowly. Thus, it inferred that the superfluousness of the words "political subdivision" "cannot alter our reading of the entirety of the FSIA, in which corporations with ATR's precise characteristics may be considered an agency or instrumentality of a foreign state." *Id.* at 940–41. Moreover, the district court in *In re Aircrash Disaster Near Roselawn, Indiana on October 31, 1994,* noted that it is "inconceivable that Congress intended to nullify [the definition of foreign state in § 1603(a) ] in the section immediately following it through the roundabout method of including a reference to political subdivision and inviting the reader to rely on the canon of statutory construction *expressio unius est exclusio alterius* ('Expression of one thing is the exclusion of another')." 909 F.Supp. 1083, 1096 (N.D.Ill. 1995). The Seventh Circuit speculated that Congress probably included "political subdivision" for emphasis and omitted "agency or instrumentality" because that phrase would render the definition circular. *Accord, Linton v. Airbus Industrie Aeroformation,* No. 14–95–00371–CV, 1996 WL 515483, at *8 (Tex.Ct.App. Sept. 12, 1996) ("[W]e can perceive no policy reason why tiering through an intermediary majority owned by a foreign state should not be permitted under the FSIA."); *see also Credit Lyonnais v. Getty Sq. Assoc.,* 876 F.Supp. 517, 519–20 (S.D.N.Y. 1995); *New York Bay Co. v. State Bank of Patiala,* No. 93 Civ. 6075, 1994 WL 369406, at *2 (S.D.N.Y. July 12, 1994).

These cases demonstrate that the proper interpretation of § 1603(b)(2) cannot be resolved simply by reference to the text. Favoring one interpretation leaves an inconsistency in another part of the statute. Neither the Ninth nor the Seventh Circuit's attempt to explain away the inconsistency is dispositive. The Ninth Circuit's distinction between "includes" and "defines as" is no more convincing evidence of congressional intent than the Seventh Circuit's attempt to explain the superfluousness of the term "political subdivision" by arguing that inclusion of "agency or instrumentality" would have made the definition circular. Both appeal to one's sense of symmetry, but neither is superior as an explanation of what Congress intended.

■ Congress's intentions must be inferred from other sources. As set forth below, the combination of several factors, including Congress's explicit rejection in the FSIA of the theretofore prevailing international "separate entity rule" in the case of corporations owned by foreign states or political subdivisions, the remoteness of corporations owned by agencies or instrumentalities from sovereign control, and the far-reaching consequences of including such corporations within the definition of foreign state coupled with the ambiguous language on which such consequences would have to rest, lead me to conclude that Congress intended a narrow interpretation of "agency or instrumentality"—*i.e.,* that corporations a majority of whose shares are owned by agencies or instrumentalities of foreign states are · not themselves agencies or instrumentalities.

The prevailing international rule as to corporations owned by foreign states, and the rule adopted in many pre-FSIA United States cases, is the "separate entity" rule. *See* William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?,* 65 Tul.L.Rev. 535, 542–65 (1991). Under this rule, entities with separate legal personalities are presumed not to possess sovereign immunity; the presumption can be overcome by demonstrating that the organization performs sovereign, rather than commercial, acts. *Id.* at 542–43. This rule is based on the assumed independence of separate legal entities. The FSIA reversed this presumption in the case of corporations owned by foreign states and political subdivisions and extended immunity to these corporations, subject to the commercial activity and other exceptions. Thus, Congress expressly brought such corporations within the FSIA and their immunity is governed by its provisions. By contrast, most other foreign states still follow the "separate entity" rule, which places on the foreign corporation the burden to demonstrate that it is immune from suit.

As the Ninth Circuit warned, extending FSIA coverage to corporations owned by agencies or instrumentalities would extend

FSIA coverage to "every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision." *Gates,* 54 F.3d at 1462. Many corporations with distant government investment, even if far removed from sovereign control, would be covered, and the extension of FSIA coverage to these remotely governmental corporations has several important consequences.

First, there is no right to a jury trial in any case involving an entity defined as a foreign state under the FSIA, even if the commercial activity exception removes immunity. *See* 28 U.S.C. § 1441(d); *Bailey v. Grand Trunk Lines New England,* 805 F.2d 1097, 1100 (2d Cir.1986), *cert. denied,* 484 U.S. 826, 108 S.Ct. 94, 98 L.Ed.2d 54 (1987); *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui",* 639 F.2d 872, 878 (2d Cir.1981). Thus, a broad interpretation of the statute would eliminate the plaintiff's right to a jury trial in any suit against a corporation owned by an agency or instrumentality of a foreign state.

Second, designation of an entity as a foreign state has implications for determining personal jurisdiction. If such an entity is covered by the FSIA, that statute would then provide the sole basis for obtaining jurisdiction over it. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 435 n. 3, 109 S.Ct. 683, 688 n. 3, 102 L.Ed.2d 818 (1989). The terms of the commercial activity exception, rather than those of the state long-arm statute, would be the method for obtaining jurisdiction over such corporations. Under the New York long-arm statute, for example, general personal jurisdiction may be obtained over an entity that does business in New York. *See* N.Y.C.P.L.R. § 301 (McKinney 1990). As to such an entity, the claim in suit need not arise from the business that is done in New York. However, under the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), the claim in suit must arise from a commercial activity performed in the United States, or from "an act performed in the United States in connection with a commercial activity of the

foreign state elsewhere," or from "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (1994). Under the FSIA standard, the commercial activity "bearing the nexus [to the United States] must be the same activity that gives rise to the claim." Hoffman, 65 Tul.L.Rev. at 576; *see also Barkanic v. General Administration of Civil Aviation of the Peoples Republic of China,* 822 F.2d 11, 13 (2d Cir.) ("[A] nexus is required between the commercial activity in the United States and the causes of action."), *cert. denied,* 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987).

Thus, there will be situations where United States courts will lack jurisdiction over a matter as a result of classifying the corporation as a foreign state—*e.g.,* where a corporation does business in the United States but the actual claim arises from business transacted elsewhere and with no effect on the United States. *See, e.g., Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation,* 730 F.2d 195, 199 (5th Cir.1984).

Third, an action involving a foreign state may be removed to federal court. 28 U.S.C. § 1441(d) (1994). This impinges on a plaintiff's traditional right to choose its forum. Thus, classification of each of these corporations as a foreign state will give federal courts jurisdiction in every case in which one of them is named. Fourth, the burden of production, although not of persuasion, as to the applicability of an exception to sovereign immunity would shift to the plaintiff once an entity is deemed a foreign state. *See Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for A.W. Galadari,* 12 F.3d 317, 325 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994).

Thus, Congress deviated from prevailing practice in extending the FSIA to cover corporations owned by a foreign state or its political subdivisions. However, Congress was explicit and unambiguous in this departure from previous practice. Because of the important consequences of a further extension of the FSIA to include corporations

owned by agencies and instrumentalities, I believe Congress would have been just as explicit and unambiguous in stating its intention that such entities fall under the FSIA if it so intended.

Given these factors—a) the prevailing international rule and the earlier United States cases presuming that corporations were not protected by sovereign immunity; b) Congress's explicit reversal of this presumption in the case of corporations owned by foreign states or political subdivisions; c) the fact that a broad interpretation would further extend foreign state status to corporations extremely remote from sovereign control; and d) the important consequences that flow from such a classification—it does not seem to me reasonable to use extremely ambiguous language to find that Congress intended to include corporations majority-owned by agencies or instrumentalities of foreign states in its definition of foreign states. If Congress so intended, I believe it would have been as explicit as it was in extending immunity to corporations majority-owned by foreign states or their political subdivisions. Thus, I find that a corporation a majority of whose shares are owned by an agency or instrumentality of a foreign state is not itself an agency or instrumentality, and therefore is not a foreign state under the FSIA.

Finally, defendant cites cases in three courts that have previously found Skopbank to be a foreign state. However, these cases do not compel a similar conclusion here. First, two of these courts determined that Skopbank was a foreign state at a time when it was owned by the Bank of Finland. *See Balentine v. Union Mortgage Co.,* 795 F.Supp. 266 (N.D.Ill.1992); *Murray v. Union Mortgage Co.,* No. 91–0799–RV–M, slip op., 1992 WL 247409 (S.D.Ala. Jan. 14, 1992) (submitted as Biester Aff., Ex. G) Although I need not pass on the issue of whether the Bank of Finland is an "agency or instrumentality" or a "political subdivision" of a foreign state, I find the analysis in those cases inapplicable here. Second, in *Balentine,* Skopbank's status was not contested but was merely assumed without analysis. *See Balentine,* 795 F.Supp. at 269 n. 3. Finally, in the third case, *Government Guarantee Fund*

*v. Great Cruz Bay Development Co.,* Civ. No. 1991–355, slip op. at 6 (D.V.I. Dec. 7, 1994) (submitted as Notice of Removal, Ex. B), the court accepted the GGF's characterization of itself as a "governmental institution" and concluded, based on *O'Connell,* that ownership by a governmental institution was sufficient to confer foreign state status on Skopbank. However, the court did not analyze the distinction between "political subdivision" and "agency or instrumentality," or delve into the GGF's legal characteristics. That case was also decided in a different legal landscape because the Ninth Circuit had not yet decided *Gates.* Further, to the extent it is inconsistent with the analysis above, I respectfully decline to follow it.

■ Here, the GGF is an agency or instrumentality of Finland. The GGF owns a majority of Skopbank's shares. A corporation a majority of whose shares are owned by an agency or instrumentality is not a foreign state under the FSIA. Thus, Skopbank is not a foreign state under the FSIA, and this case is not removable under 28 U.S.C. § 1441(d).

### IV.

Defendant asserts that this case is removable also under 28 U.S.C. § 1441(b), which establishes federal question jurisdiction. According to defendant, this case raises questions of federal law "since the Finnish Government has substantial interests in regulating its banking system, including the collection of loans. The Finnish Government's interests outweigh other interests." (Notice of Removal ¶ 10) This claim evaporates on close scrutiny.

■ Issues of federal common law present federal questions, *see Illinois v. City of Milwaukee, Wisconsin,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and "the body of law which pertains to ... issues of international dimension may be classified as federal common law." *Chapalain Compagnie v. Standard Oil Co. (Indiana),* 467 F.Supp. 181, 185 (N.D.Ill.1978). However, for a case to be removable as engaging issues of international relations, the defendant must satisfy the well-pleaded complaint rule. Un-

der the well-pleaded complaint rule, "lower federal courts 'have jurisdiction to hear ... only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Republic of Philippines v. Marcos,* 806 F.2d 344, 352 (2nd Cir.1986) (quoting *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 2855–56, 77 L.Ed.2d 420 (1983)), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987). Thus, defendant must establish from the claims necessarily stated in the complaint that resolution of such claims requires either determinations that directly and significantly affect foreign relations or determinations of the law of international relations. *See Marcos,* 806 F.2d at 352; *Delgado v. Shell Oil Co.,* 890 F.Supp. 1324, 1348–49 (S.D.Tex.1995). Here, the well-pleaded complaint rule is not satisfied.

First, defendant has failed to demonstrate that Skopbank's conduct in relation to the St. John resort implicates issues of American foreign relations. Defendant vaguely claims that this case could affect Finland's right to regulate its banks. However, this is an action against Stanton, in his capacity as an officer of Skopbank, for actions taken in the United States, in relation to a property on which the bank held a mortgage. Although the GGF owns a controlling interest in Skopbank, that does not mean that any case challenging any action taken by a bank under the GGF's control raises issues of international relations. Further, now that I have found that Skopbank is not a foreign state under the FSIA, it is an even greater leap to assert that its actions raise issues of international relations. Finally, this case does not interfere with Finland's regulation of its banks; rather, any effect on Finland's regulatory conduct is incidental.

Second, defendant has failed to allege that the resolution of any of plaintiff's claims—tortious interference with contractual relations or prospective economic advantage, prima facie tort or civil conspiracy—requires the determination of some issue of international law of foreign relations, such as the act

of state doctrine or the interpretation of foreign laws or regulations. As the *Delgado* court stated, "although important issues of international significance might be implicated by the decisions made by a state court in this case, because no removable federal question implicating the international law of foreign relations necessarily appears in any claim within plaintiffs' well-pleaded petitions," removal is improper. *Delgado,* 890 F.Supp. at 1349.

Plaintiff relies upon *Grynberg Production Corp. v. British Gas, p.l.c.,* 817 F.Supp. 1338 (E.D.Tex.1993), where removal was granted because plaintiff sought an order from a Texas court granting specific performance of its alleged right to mine mineral resources in Kazakhstan. The court found that Kazakhstan's interest in allocating its own mineral resources were vitally affected by the lawsuit. *Id.* at 1356–63. Further, it found that resolution of issues of international relations law, such as the extent of a nation's ownership of its natural resources and questions of sovereign succession, was necessary to resolve the state law claims asserted in the complaint. *Id.* at 1363. In *Grynberg,* therefore, issues of international relations were squarely raised and resolution of those issues was necessary to resolve state law claims. Neither of these conditions is present here. Thus, defendant has failed to demonstrate that a federal common law question exists and removal under § 1441(b) is improper.

## V.

■■■ Finally, defendant asserts that removal is proper under the All Writs Act, 28 U.S.C. § 1651. That Act provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651 (1994). "A district court, in exceptional circumstances, may use its All Writs authority to remove an otherwise unremovable state court case in order to 'effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *In re Agent Orange Product Liability Litigation,* 996 F.2d 1425, 1431 (2d

Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994). However, "the All Writs Act is not a jurisdictional blank check which district courts may use whenever they deem it advisable." *Id.*

■ The All Writs Act may not be applied to remove this action for two reasons. First, this court has not issued any orders in the exercise of its jurisdiction that are threatened with frustration nor is there any current case within its jurisdiction endangered by this action. The text of the statute specifically requires that the writ be issued to protect a court's jurisdiction. In *United States v. International Brotherhood of Teamsters,* 907 F.2d 277, 281 (2d Cir.1990), the Second Circuit stated that

> Appellants correctly note that the Act does not enlarge the jurisdiction of the federal courts ... all we hold is that if jurisdiction over the subject matter of and the parties to litigation is properly acquired, the All Writs Act authorizes a federal court to protect that jurisdiction even though non-parties may be subject to the terms of the injunction.

*Id.* at 281. Thus, in order to remove a case under the All Writs Act, a court must both have jurisdiction and be preserving it or protecting it through the removal against attack elsewhere. Here, I have no subject matter jurisdiction over this case or over the cases which defendant claims are being attacked. Because Stanton is a resident of New York, the action cannot be removed based on diversity jurisdiction. *See* 28 U.S.C. § 1441(b). Further, the orders and opinions which defendant claims are being collaterally attacked were not issued by this court. Thus, removing this case would not preserve this court's jurisdiction, but in fact would be an initial exercise of jurisdiction. The proper court to grant removal under the All Writs Act, if any, therefore would be the District Court for the Virgin Islands, whose orders are allegedly in danger of being overruled or frustrated.

Second, even if I possessed jurisdiction over a matter threatened or collaterally attacked by this action, I would not find this case so extraordinary as to justify removal under the All Writs Act. The situations in which the All Writs Act has been applied to remove actions from state court all involve consent decrees or complex class litigation that would be undermined by actions in other courts. *See, e.g., In re Agent Orange,* 996 F.2d at 1431; *United States v. City of New York,* 972 F.2d 464, 469 (2d Cir.1992); *Teamsters,* 907 F.2d at 280–81; *Yonkers Racing Corp. v. Yonkers,* 858 F.2d 855, 863 (2d Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989); *Neuman v. Goldberg,* 159 B.R. 681 (S.D.N.Y.1993). This case does not involve complex class litigation or a threat to a consent decree or any analogously extraordinary situation. In fact, defendant has presented no evidence of an imminent threat that the state court will overturn or frustrate the federal courts' orders. Defendant may assert res judicata or collateral estoppel in state court to bar a relitigation of previously decided issues. There is no reason to assume that if these doctrines are applicable, the state court will refuse to apply them. "While there is a theoretical potential for inconsistent or conflicting judgments in the state court and federal actions, the realistic likelihood of such an occurrence is small." *Pan Atlantic Group, Inc. v. Republic Insur. Co.,* 878 F.Supp. 630, 643 (S.D.N.Y.1995). Thus, this case does not present an extraordinary situation justifying application of the All Writs Act, and this case is not removable under the All Writs Act.

Defendant has failed to assert any grounds for removing this case from the state court and the case therefore must be remanded to New York State Supreme Court, New York County.

\*　　\*　　\*　　\*　　\*　　\*

For the reasons set forth above, plaintiff's motion to remand is granted, and the Clerk is directed to remand this case to Supreme Court, New York County.

SO ORDERED.