440 F.3d 579
 Theo GARB, Bella Jungewirth, Sam Lefkowitz, Peter Koppenheim, Judah Weller, Chana Lewkowicz, Samuel Goldin, Karl Dlamond, Hala Sobol, Saul Klausner, and Goldie Knobel, on behalf of themselves and all others similarly situated, Plaintiffs-Appellants,
v.
REPUBLIC OF POLAND, Ministry of the Treasury of Poland (Ministerstwo Skarbu Panstwa), and John Does #1-100, Defendants-Appellees.
 Docket No. 02-7844.
 United States Court of Appeals, Second Circuit.
 Argued April 15, 2003.
 Remanded June 14, 2004.
 Submitted September 10, 2004.
 Decided March 3, 2006.
 
 Stephen A. Whinston (Edward W. Millstein, Berger & Montague, P.C., Philadelphia, PA, Edward E. Klein, Klein & Solomon, LLP, New York, NY, on the brief), Berger & Montague, P.C., Philadelphia, PA, for Plaintiffs-Appellants Garb, et al.
 Owen C. Pell (Karen M. Asner, on the brief), White & Case LLP, New York, NY, for Defendants-Appellees Republic of Poland, et al.
 Douglas Hallward-Driemeier (William H. Taft IV, Jonathan B. Schwartz, Wynne M. Teel, Robert D. McCallum, Jr., Gregory G. Katsas, Jr., Mark B. Stern, on the brief), Department of Justice, Washington, D.C., for Amicus Curiae United States of America in support of Defendant-Appellee Republic of Poland.
 Charles Chotkowski, Fairfield, CT, Amicus Curiae.
 Before KEARSE, CABRANES, and STRAUB, Circuit Judges.
 Judge STRAUB dissents in a separate opinion.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 We consider here claims emerging from the re-drawing of the map of Europe following the defeat of the Axis Powers in the Second World War, the displacement of millions of people, particularly surviving Jews, in much of the continent, and the installation by force of governments in Central and Eastern Europe. See Michael R. Marrus, The Unwanted European Refugees in the Twentieth Century 335-36 (1985) (describing the forced migration of Jews and expropriation of Jewish assets throughout Central and Eastern Europe following the Second World War), Compl. ¶ 3,[1] see also Malcolm J. Proudfoot, European Refugees 1939-52, at 190 (1956) ("When the [Second World] [W]at ended, there were approximately 11 million non-German displaced persons in Europe who required repatriation"), id. at 189 (providing a breakdown by nationality of persons requiting repatriation).
 
 
 2
 Plaintiffs appeal from a judgment of the United States District Court for the Eastern District of New York (Edward R. Korman, Chief Judge) dismissing their claims against the Republic of Poland and the Ministry of the Treasury of Poland for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). See Garb v. Republic of Poland, 207 F.Supp.2d 16 (E.D.N.Y.2002). Plaintiffs' claims, which at the pleadings stage we accept as true in all respects, see, e.g., Hallock v. Bonner, 387 F.3d 147, 150 (2d Cir.2004), arise from the mistreatment of Jews in Poland after the Second World War—mistreatment that Chief Judge Korman properly described as "horrendous" Garb, 207 F.Supp.2d at 17. In particular, plaintiffs challenge the Polish Government's expropriation of their property following the asserted enactment of post-war legislation designed for that purpose. Id. at 18.
 
 
 3
 As the District Court aptly noted, "strong moral claims are not easily converted into successful legal causes of action." Id. at 39 (internal quotation marks and alteration omitted) Despite the severe injuries asserted by plaintiffs, the capacity of United States courts to exercise jurisdiction over plaintiffs' claims hinges on a legal inquiry narrowly circumscribed by statute. It is well settled that the only source of subject matter jurisdiction over a foreign sovereign in the courts of the United States is the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611, which codifies several exceptions to the long-established doctrine of foreign sovereign immunity.
 
 
 4
 Following a remand from the Supreme Court, see Republic of Poland v. Garb, 542 U.S. 901, 124 S.Ct. 2835, 159 L.Ed.2d 265 (2004), we consider for the second time whether plaintiffs' claims fall under these statutory exceptions. In the period between our previous disposition of this matter, see Garb v. Republic of Poland, 72 Fed.Appx. 850 (2d Cir.2003) (summary order), and the Supreme Court's remand, the question of the FSIA's retroactivity has been resolved in the affirmative, see Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Accordingly, we now apply the FSIA retroactively to claims arising from events that took place prior to that statute's 1976 enactment.
 
 
 5
 We hold that none of the FSIA's exceptions to foreign sovereign immunity applies here and that subject matter jurisdiction is therefore lacking. First, we hold that plaintiffs have not satisfied the "commercial activity" exception of the FSIA, 28 U.S.C. § 1605(a)(2), because (a) a state's confiscation of property within its borders is not a "commercial" act, (b) the subsequent commercial treatment of expropriated property is not sufficiently "in connection with" the prior expropriation to satisfy the "commercial activity" exception, and (c) we decline to credit plaintiffs' recharacterization of what are in essence "takings" claims as "commercial activity" claims. Second, we hold that plaintiffs have not satisfied the "takings" exception of the FSIA, 28 U.S.C. § 1605(a)(3), because (a) plaintiffs seek to recover property that is not "present in the United States," (b) in such circumstances, plaintiffs must show that the property "is owned or operated by an agency or instrumentality of the foreign state," (c) plaintiffs allege that the property is "owned by" the Ministry of the Treasury of Poland, Appellants' R. at 15, and (d) the Ministry of the Treasury of Poland is not an "agency or instrumentality" of the Republic of Poland because its "core function" is governmental rather than commercial.
 
 BACKGROUND
 
 6
 Plaintiffs are "Jewish persons and entities (and their heirs and successors) who owned real property in Poland during the period September 1, 1939 to May 30, 1945" Garb, 207 F.Supp.2d at 19 (internal quotation marks omitted). They filed suit in the District Court on June 18, 1999, [A 2] seeking redress from the Republic of Poland and the Ministry of the Treasury of Poland for expropriation of real property from Jews in post-War Poland. See id. at 17-19. The District Court's thorough opinion sets forth plaintiffs' claims in commendable detail, including the post-War violence perpetrated by the government of Poland against Polish Jews who had returned from the Soviet Union, the expropriation of property from those Jews, and the Polish government's actual and constructive participation in that violence and expropriation. Id.
 
 
 7
 Because this suit sought to hold a foreign sovereign State liable in the courts of the United States, and because, under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts[,] unless a specified [statutory] exception applies," Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993),[2] plaintiffs have asserted that two exceptions to the FSIA apply to their claims—namely, (1) the "commercial activity" exception of 28 U.S.C. § 1605(a)(2),[3] and (2) the "takings" exception of 28 U.S.C. § 1605(a)(3).[4]
 
 
 8
 Defendants contested the applicability of those exceptions and moved to dismiss this action for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). In a comprehensive opinion, the District Court granted defendants' motion, see Garb, 207 F.Supp.2d at 39-40, finding that the "commercial activity" exception did not apply because, inter alia, (1) a government's expropriation of property from its own citizens "is a quintessentially sovereign act and is never viewed as having commercial character," id. at 31 (internal quotation marks omitted), and, in any event, (2) plaintiffs had failed to demonstrate, as required, that the assertedly commercial activity had a "direct effect" in the United States, id. at 32-33.
 
 
 9
 The District Court also concluded that plaintiffs could not rely on the "takings" exception to foreign sovereign immunity because (1) the FSIA's "takings" exception could not be applied retroactively to hold a foreign sovereign liable for conduct that predates the 1976 enactment of the FSIA, id. at 25-30, and alternatively, even if the "takings" exception were to be applied retroactively, defendants would still enjoy sovereign immunity because (2) plaintiffs had not established that a State's expropriation of property from its own nationals violates international law—a prerequisite for the application of the "takings" exception, id. at 33-34, and (3) the property in question is apparently neither "present in the United States" nor "owned or operated by an agency or instrumentality of the foreign state," id. at 34-38.
 
 
 10
 The District Court granted defendants' motion to dismiss in an order entered June 24, 2002, and plaintiffs timely filed a Notice of Appeal on July 19, 2002. We consolidated the appeal with Republic of Austria v. Whileman, Nos 02-9361 & 02-3087, for the purposes of oral argument.[5] [See Garb Docket Entry of Feb. 25, 2003].
 
 
 11
 We heard oral argument on April 15, 2003, and, in light of a supervening and controlling decision by another panel of our Court in Abrams v. Societe Nationale des Chemins de Fer Francais, 332 F.3d 173 (2d Cir.2003), we filed a summary order on August 6, 2003 vacating the District Court's June 26, 2002 judgment (which had dismissed plaintiffs' claims against Poland), see Garb, 72 Fed.Appx. at 855. Relying on Abrams, we stated that this "case[] raises the threshold questions whether and on what terms the federal courts have jurisdiction under the [FSIA] to adjudicate the liability of sovereign states for conduct occurring prior to the statute's enactment [in 1976]" id. at 853. We explained, bound as we then were by Abrams, that whether the FSIA could be applied retroactively depended upon whether doing so "would have an impermissible `retroactive effect'—that is, whether applying the FSIA would `impart rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" Id. (quoting Abrams, 332 F.3d at 180-81).
 
 
 12
 As required by Abrams, we then remanded this case to the District Court to determine "the Department of State's policy prior to [the enactment of the] FSIA with respect to sovereign immunity for Poland in the circumstances presented" here Id. at 854. Defendants moved to stay the issuance of our mandate pending their petition to the Supreme Court for a writ of certiorari. We granted defendants' request for a stay on September 10, 2003.
 
 
 13
 On June 14, 2004, the Supreme Court granted defendants' petition for a writ of certiorari, vacated our judgment, and remanded this case to us "for further consideration in light of Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1[] (2004)" Republic of Poland v. Garb, 542 U.S. 901, 124 S.Ct. 2835, 159 L.Ed.2d 265 (2004).
 
 
 14
 Following the Supreme Court's order, the parties and various amicus curiae, including the United States, filed supplemental letter briefs with this Court concerning the post-Altmann disposition of this appeal. Although the legal views of the Executive concerning the proper scope of the FSIA statutory scheme are entitled to "no special deference," such views are nevertheless of "considerable interest" to federal courts. Altmann, 541 U.S. at 701, 124 S.Ct. 2240. In addition to its views of the applicable legal standards, the United States' letter brief informs us that, in this very case, "the foreign policy interests of the United States weigh against inferring the dramatic expansion of federal court jurisdiction that plaintiffs seek." See Letter of Gregory G. Katsas, Jr., Deputy Assistant Attorney General, Department of Justice, and William H. Taft IV, The Legal Adviser, Department of State (Sept. 9, 2004) ("United States Supplemental Letter"), at 9 (emphasis added). Because, for the reasons stated below, we conclude that the District Court lacked subject matter jurisdiction to consider plaintiffs' claims, we need not consider whether these claims should be dismissed in deference to the stated foreign policy interests of the Executive. See note 6, past.
 
 DISCUSSION
 
 15
 On remand, we are left to determine whether, in light of Altmann's requirement of retroactive application of the FSIA, the District Court may properly exercise subject matter jurisdiction over this case pursuant to either the FSIA's "commercial activity" or "takings" exceptions to the long-established doctrine of foreign sovereign immunity. We hold that the District Court correctly found both exceptions inapplicable and therefore properly dismissed the complaint for lack of subject matter jurisdiction.[6]
 
 I. The Effect of Altmann
 
 16
 In Altmann, the Supreme Court departed from what it termed a pre-existing "antiretroactivity presumption," 541 U.S. at 696, 124 S.Ct. 2240, and held that the FSIA, including its exceptions, is applicable to conduct that preceded its enactment. The Court explained that because the doctrine of foreign sovereign immunity reflects "current political realities and relationships," courts have traditionally "resolved questions of foreign sovereign immunity by deferring to the decisions of the political branches." Id. (internal quotation marks omitted). The Court identified the FSIA as "the most recent such decision" and decided to defer to it—that is, to apply it retroactively—rather than to "presume" it inapplicable "merely because it postdates the conduct in question." Id.
 
 
 17
 We have since interpreted Altmann as rendering unnecessary precisely the sort of investigation into pre-FSIA sovereign immunity doctrine that had been prescribed in our 2003 Abrams decision and required by our August 6, 2003 summary order in this case. See Abrams v. Socété Nationale Des Chemins De Fer Francais, 389 F.3d 61, 63 (2d Cir.2004) ("After Altmann, it is no longer necessary to rely upon the State Department's past determinations in ascertaining whether FSIA's application to pre-enactment wrongdoing is impermissibly retroactive. Indeed, in its holding, the Supreme Court expressly disapproved of this historical approach"). Accordingly, we hold that the FSIA applies here, and we thus consider whether plaintiffs have demonstrated that their claims fall under any exception to the FSIA's presumption of sovereign immunity, see 28 U.S.C. § 1604, note 2, ante, such that these claims may be pursued in a United States court.
 
 II. The Foreign Sovereign Immunities Act
 
 18
 In 1812, Chief Justice Marshall famously articulated the doctrine of absolute sovereign immunity, a doctrine deeply rooted in the principles of sovereign consent and reciprocity—concepts that form the touchstones of international law. Because a sovereign enjoys "full and complete power within its own territories," and because "[t]he jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power," the courts of the United States will not "degrade the dignity of [another] nation" by asserting jurisdiction over claims affecting the rights of the foreign sovereign, absent that sovereign's consent. The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136-37, 3 L.Ed. 287 (1812) See generally Joseph W. Glannon & Jeffery Auk, Politus and Personal Jurisdiction Suing State Sponsors of Terrorism Under the 1996 Amendments to the Foreign Sovereign Immunities Act, 87 Geo LJ 675, 691 (1999) ("As a practical matter, considerations of reciprocity compelled foreign sovereign immunity, nations expected to receive foreign sovereign immunity as well as to accord it Chief Justice Marshall crystallized the thinking of the time in Schooner").
 
 
 19
 This general doctrine of absolute sovereign immunity survived until 1952, when the so-called Tate Letter enunciated as United States policy a new, "restrictive" theory of sovereign immunity. See Letter of Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B Perlman (May 19, 1952), reprinted in 26 Dep't of State Bull 984, 984-85 (1952), and in Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301, app 2 at 711-15 (1976), see also Sugarman v. Aeromexico, Inc., 626 F.2d 270, 273-74 (3d Cir.1980) (reprinting the "core" of the Tate Letter). The Tate Letter proposed that "the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperit) of a state, but not with respect to private acts (jure gestionis)." Sugarman, 626 F.2d at 274 See generally William A. Dobrovir, A Gloss on the Tate Letter's Restrutive Theory of Sovereign Immunity, 54 Va. L.Rev. 1 (1968) (describing the Tate Letter's "restrictive" theory of sovereign immunity).
 
 
 20
 When Congress enacted the FSIA in 1976, it intended to codify the Tate Letter. See Sugarman, 626 F.2d at 274 ("The Act was a codification of the Letter"), see also H.R.Rep. No. 94-1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 ("[The FSIA] would codify the so-called `restrictive' principle of sovereign immunity, as presently recognized in international law[, as] adopted by the Department of State in 1952 and [as] followed by the courts and by the executive branch ever since.") Consistent with the Tate Letter, the FSIA specified "certain types of cases," Sugarman, 626 F.2d at 274, in which immunity would not be afforded to a foreign sovereign Those cases fall under, inter alia, the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), and the "takings" exception, 28 U.S.C. § 1605(a)(3), to the foreign sovereign immunity recognized by the FSIA. In light of this background, we now consider whether either of those exceptions applies here.
 
 
 21
 III. The "Commercial Activity" Exception to Presumptive Foreign Sovereign Immunity (28 U.S.C. § 1605(a)(2))
 
 
 22
 Plaintiffs assert that the District Court may exercise jurisdiction over their claims pursuant to 28 U.S.C. § 1605(a)(2), see note 3, ante, the "commercial activity" exception of the FSIA. Under this provision, a plaintiff may establish an exception to the immunity of a foreign sovereign defendant if his claims are "based upon":
 
 
 23
 [1] a commercial activity carried on in the United States by the foreign state, or upon
 
 
 24
 [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, or upon
 
 
 25
 [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[]
 
 
 26
 28 U.S.C. § 1605(a)(2). Plaintiffs rely on the last of these three alternative grounds. Appellants' Br. at 62.
 
 
 27
 As a threshold step in assessing plaintiffs' reliance on the "commercial activity" exception, we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims. The District Court found that, regardless of the subsequent commercial treatment of the expropriated property, plaintiffs' claims are "based upon" the acts of expropriation.[7] See Garb, 207 F.Supp.2d at 31 ("Plaintiffs' claims are `based upon' the manner in which the property was obtained, not its subsequent management."). We agree with this description of plaintiffs' claims. See Callejo v. Bancomer, S.A., 764 F.2d 1101, 1109 (5th Cir.1985) (explaining that to determine the basis of a claim, a court should focus on the "gravamen of the complaint"), cited with approval in Nelson, 507 U.S. at 357, 113 S.Ct. 1471, Garb, 207 F.Supp.2d at 19 (listing plaintiffs' property-based claims).
 
 
 28
 We also agree with the District Court that the expropriations by defendants do not fall within the "commercial activity" exception of the FSIA. Expropriation is a decidedly sovereign—rather than commercial—activity.[8] See, e.g., Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir.1977) ("Expropriations of property within the boundaries of the sovereign state are traditionally considered to be public acts of the sovereign removed from judicial scrutiny"), see also Alberti v. Empresa Nicaraguense De La Carne, 705 F.2d 250, 254 (7th Cir.1983) (recognizing that the nationalization of property is a "quintessential [g]overnment act"), Haven v. Rzeczpospolita Polska (Republic of Poland), 68 F.Supp.2d 947, 954 (N.D.Ill.1999) ("It is obvious that governmental expropriation of private property under governmental authority is the classic type of [sovereign, rather than commercial,] activity").
 
 
 29
 Moreover, plaintiffs' property was not expropriated "in connection with a commercial activity of the foreign state." The statutory term "in connection," as used in the FSIA, is a term of art, and we interpret it narrowly. Accordingly, we have noted that "[a]cts are `in connection' with commercial activity so long as there is a `substantive connection' or a `causal link' between them and the commercial activity." Hanil Bank v. Pt. Bank Negara Indonesia (Persero), 148 F.3d 127, 131 (2d Cir.1998) (quoting Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 726 (9th Cir.1997)), see also Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for A.W. Galadari, 12 F.3d 317, 330 (2d Cir.1993) (declining to read "the `connection' language of § 1605(a)(2) to include tangential commercial activities to which the `acts' forming the basis of the claim have only an attenuated connection").
 
 
 30
 Concededly, the expropriation of property from plaintiffs—indeed, from anyone who claims unlawful taking of property—is, in some sense, "connected" to any subsequent commercial treatment of that property or its proceeds. Had there been no expropriation, there would have been no properties to treat in a commercial manner, in the circumstances presented here, Poland would have no properties to manage or sell. Such a connection, however, is simply too "attenuated," and not substantive enough, to satisfy § 1605(a)(2). See Drexel, 12 F.3d at 330, see also Stena Rederi AB v. Comision de Contratos, 923 F.2d 380, 387 (5th Cir.1991) (holding that the "in connection with" requirement of the "commercial activity" exception was not satisfied where "the few commercial acts on which [the plaintiff] relies for its argument that [the defendant] has no sovereign immunity are unrelated to the facts on which [the plaintiff] relies for its causes of action").
 
 
 31
 Our reasoning—that subsequent commercial transactions involving expropriated property do not give rise to subject matter jurisdiction over claims arising from the original expropriation—is consistent with Congress's intention to deny sovereign immunity to foreign States only with respect to commercial, and not sovereign, acts. In recommending passage of the FSIA, the Report of the Judiciary Committee of the House of Representatives ("House Report" or "Report") explained that the third clause of § 1605(a)(2) was intended to "embrace commercial conduct." H.R.Rep. No. 94-1487, at 19 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6618 (emphasis added). Because, as noted above, a State's exercise of its power to expropriate property within its borders is a decidedly sovereign act, it would undermine the express intent of Congress to deprive Poland of its sovereign immunity on "commercial activity" grounds.
 
 
 32
 Finally, we reject plaintiffs' assertion that the "commercial activity" exception applies to their claims because this assertion simply recharacterizes plaintiffs' "takings" argument. Federal courts have repeatedly rejected litigants' attempts to establish subject matter jurisdiction pursuant to other FSIA exceptions when their claims are in essence based on disputed takings of property. The Fifth Circuit, for example, has held that a plaintiff's claim,
 
 
 33
 although sounding in tort [namely, a government's "conversion" of property], is essentially a claim for an unjust taking of property Congress has provided an exception in Section 1605(a)(3) for takings of property that violate international law. We do not believe that Congress intended plaintiffs to be able to rephrase their takings claims in terms of [another FSIA exception] and thereby bring the claims even where the takings are permitted by international law
 
 
 34
 de Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1398 (5th Cir.1985). The Ninth Circuit has agreed that when a claim is based on what is:
 
 
 35
 in substance a taking of property it should be considered only under the takings exception of section 1605(a)(3). To hold otherwise would be to allow plaintiffs to escape the requirements of section 1605(a)(3) through artful recharacterization of their takings claims
 
 
 36
 Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1106 (9th Cir.1990) (emphasis added). see also Alberti, 705 F.2d at 254 (holding that when the nationalization of a property—a "quintessential [g]overnment act"—is the basis of a claim, plaintiffs may not "transform th[e] governmental dispute into a commercial dispute" by reference to peripheral commercial activities about which there is no controversy), Garb, 207 F.Supp.2d at 33 (finding "commercial activity" exception inapplicable where "the activities allegedly causing a `direct effect' in the United States have no legal significance to this action"). Accordingly, we hold that the District Court lacked subject matter jurisdiction over plaintiffs' claims pursuant to the FSIA's "commercial activity" exception and proceed to consider whether plaintiffs' claims fall within the FSIA's "takings" exception.
 
 
 37
 IV. The "Takings" Exception to Presumptive Foreign Sovereign Immunity (28 U.S.C. § 1605(a)(3))
 
 
 38
 To establish subject matter jurisdiction pursuant to the "takings" exception of the FSIA, a plaintiff must demonstrate each of four elements:
 
 
 39
 (1) that rights in property are at issue,
 
 
 40
 (2) that the property was "taken",
 
 
 41
 (3) that the taking was in violation of international law, and either
 
 
 42
 (4)(a) "that property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or
 
 
 43
 (4)(b) "that property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[]".
 
 
 44
 28 U.S.C. § 1605(a)(3), note 4, ante, see also Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 251 (2d Cir.2000) (specifying criteria for the "takings" exception of the FSIA).
 
 
 45
 Defendants assert that plaintiffs have failed to satisfy several of these requirements Appellees' Br. at 32-40. We assume for the sake of discussion that plaintiffs have satisfied the two threshold elements of the "takings" exception—namely, that rights in property are at issue here and that property was indeed taken. It is the third and fourth elements that, according to the District Court, pose the greatest obstacles to asserting subject matter jurisdiction over plaintiffs' claims Noting that "many of the plaintiffs appear to have been Polish citizens at the time of expropriation," Garb, 207 F.Supp.2d at 33, the District Court reasoned that "`no consensus existed' on the issue whether the right to be free from the discriminatory and uncompensated taking of property was one of the `fundamental rights' conferred by international law `upon all people vis-a-vis their own governments.'" id. at 34 (emphasis added) (quoting Filartiga v. Pena-Irala, 630 F.2d 876, 884-85, 888 n. 23 (2d. Cir. 1980) (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964))). Accordingly, the District Court concluded that a substantial legal "hurdle" must be overcome before plaintiffs can show that their property was taken in violation of international law. See id. On appeal, plaintiffs maintain that "[t]he expropriation here was contrary to international law since it was discriminatory in nature, being aimed solely at Jews." Appellants' Br. at 15.
 
 
 46
 In the alternative, the District Court held that plaintiffs' claims failed to meet the fourth element of the "takings" exception, because they have not shown that the property at issue is either (a) "present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (b) "owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). The first of these alternative showings sets a higher threshold of proof for suing foreign states in connection with alleged takings by requiring that the property at issue be "present in the United States." The amended complaint in this case defined the relevant properties as "real properties and improvements thereon in Poland". Compl ¶ 2 (emphasis added) [A. 6] Accordingly, the District Court concluded that "the property at issue here is in Poland." Garb, 207 F.Supp.2d at 33. Because plaintiffs do not challenge this conclusion on appeal, they cannot rely on the first clause of the fourth element of § 1605(a)(3), which sets forth the conditions under which a plaintiff may assert takings claims against "foreign state[s]."
 
 
 47
 Rather, plaintiffs rely on the second clause of the fourth element, which permits a plaintiff to bring suit against an "agency or instrumentality of [a] foreign state," provided that the agency or instrumentality "own[s] or operate[s]" the property in question and "is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). The District Court concluded that, "as plaintiffs concede, the Republic of Poland is not an `agency or instrumentality' of a foreign state," because it is "the foreign state itself." Garb, 207 F.Supp.2d at 34. Thus, the question before the District Court was whether the other defendant, Poland's Ministry of the Treasury, "is, on the one hand, the foreign state itself of a subdivision of it, or, on the other hand, an `agency or instrumentality' of the Republic of Poland and therefore potentially subject to jurisdiction under the second clause" of the fourth element of the "takings" exception. Id. at 34-35. In the circumstances of this case, the District Court doubted whether "the Ministry of the Treasury can be viewed as a legal entity separate from the Republic of Poland" and therefore held that "permitting the cause of action here would appear to undermine the immunity Congress intended to confer on the Republic of Poland under the FSIA." Id. at 38. On appeal, plaintiffs maintain that "[t]he Treasury is an agency and instrumentality of the Polish Government" within the meaning of § 1605(a)(3), Appellants' Br. at 15, and therefore may be sued in United States courts.
 
 
 48
 Because we hold that the Ministry of the Treasury of Poland is not an "agency or instrumentality" of the Republic of Poland, plaintiffs' claims fail to satisfy the fourth element of the "takings" exception, and we need not consider the questions of international law raised under the third element.[9]
 
 
 49
 a. "Agency or Instrumentality" Under the FSIA
 
 
 50
 The distinction between, on the one hand, agencies or instrumentalities of a foreign state, and, on the other hand, other organs or subdivisions of a foreign state, pervades the FSIA. For example, the statute provides that "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages." 28 U.S.C. § 1606 (emphasis added). Also, unlike the property of a foreign state generally, the property of an agency or instrumentality of a foreign state is subject to attachment or execution "regardless of whether the property is or was involved in the act upon which the claim is based." 28 U.S.C. § 1610(b)(2).[10]
 
 
 51
 In order to satisfy the fourth element of the "takings" exception where, as here, the property at issue is located outside the United States, plaintiffs must show that the property they seek to recover is "owned or operated by an agency or instrumentality of the foreign state." 28 U.S.C. § 1605(a)(3). An "agency or instrumentality of a foreign state" is a term of art to which the FSIA assigns a specific definition, namely "any entity".
 
 
 52
 (1) which is a separate legal person, corporate or otherwise, and
 
 
 53
 (2) which is an organ of a foreign state or political subdivision thereof,[11] or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 
 
 54
 (3) which is neither a citizen of a State of the United States as defined in [28 U.S.C. § 1332(c) and (c)] not created under the laws of any third country
 
 
 55
 28 U.S.C. § 1603(b) (footnote added). Only the first criterion is contested here—namely, whether the Ministry of the Treasury of Poland is "a separate legal person, corporate or otherwise," from the Republic of Poland.
 
 
 56
 In Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 151 (D.C.Cir.1994), the Court of Appeals for the District of Columbia Circuit considered whether the Bolivian Air Force "count[ed] as a `foreign state' or rather as an `agency or instrumentality'" of a foreign state for the purposes of 28 U.S.C. § 1608, which sets forth the FSIA's service of process provisions. Compare 28 U.S.C. § 1608(a) (service "upon a foreign state or political subdivision of a foreign state"), with 28 U.S.C. § 1608(b) (service "upon an agency or instrumentality of a foreign state"). See also 28 U.S.C. § 1603(a) (providing that, "except as used in section 1608," a "foreign state" includes its "agenc[ies] or instrumentalit[ies]"). In reaching its disposition, the Transaero Court examined the background and legislative history of the FSIA and concluded that a foreign entity's status as "a separate legal person" from a foreign state depends on "whether the core functions of the foreign entity are predominantly governmental or commercial." Id. at 151. Applying this framework, the Court of Appeals in Transaero then determined that, under the FSIA, "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the `foreign state' itself, rather than a separate `agency or instrumentality' of the state." Id. at 153.
 
 
 57
 The Fifth Circuit adopted Transaero's "core functions" approach in another case concerning the FSIA's service of process provisions, holding that "[w]hether an entity is a `separate legal person' depends upon the nature of its `core functions'—governmental vs. commercial—and whether the entity is treated as a separate legal entity under the laws of the foreign state." Magness v. Russian Federation, 247 F.3d 609, 613 n. 7 (5th Cir.2001).[12]
 
 
 58
 While neither Transaero nor Magness directly concern the amenability-to-suit of an alleged "agency or instrumentality of a foreign state" under 28 U.S.C. § 1605(a)(3), we nonetheless regard Transaero as instructive because, prior to invoking "ease of administration" as "a final reason" to prefer its "core functions" approach,[13] the Transaero Court analyzed Congress's broader use of the phrase "agency or instrumentality of a foreign state" in light of "a rich background of federal and international law," including (1) the emergence of the "restrictive" theory of sovereign immunity, which differentiates between the public and commercial acts of foreign states, (2) the venue provisions of 28 U.S.C. § 1391, which permit parties to bring suit against an "agency or instrumentality" "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business," and (3) language used in the enabling charters of governmental corporations, both in the United States and abroad. Transaero, 30 F.3d at 151-52.[14]
 
 
 59
 Indeed, our Circuit has already relied on the reasoning of Transaero (as well as on the reasoning of the District Court in this case) outside the context of the FSIA's service of process provisions. See, e.g., Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Fed'n, 361 F.3d 676, 688 (2d Cir.2004). In Compagnie Noga—which concerned the confirmation and enforcement of arbitral awards under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 53 ("Convention")—we found "no meaningful legal distinction between a sovereign and one of its political organs," Compagnie Noga, 361 F.3d at 688, and therefore concluded that "the Russian Federation and the Government [of Russia] are not separate `parties' for the purposes of confirming and enforcing an arbitral award under" the Convention, id. at 690. We reached this conclusion partly by relying on Transaero as an authoritative restatement of "federal common-law principles."[15] Id. at 688.
 
 
 60
 On at least one occasion, the District of Columbia Circuit has applied the "core functions" principle of Transaero to determine whether a governmental ministry may be sued in U.S. courts pursuant to 28 U.S.C. § 1605. See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C.Cir. 2003) Although the Roeder Court considered whether Iran's Ministry of Foreign Affairs could be sued in its capacity as an "official, employee, or agent" of a foreign state, pursuant to 28 U.S.C. § 1605(a)(7) (emphasis added), and did not contemplate the meaning of "agency of instrumentality" as defined at 28 U.S.C. § 1603(b), it nonetheless relied upon Transaero to reach its conclusion that "the Ministry of Foreign Affairs [of Iran] must be treated as the state of Iran itself rather than as its agent." Roeder, 333 F.3d at 234.[16]
 
 
 61
 Because we are persuaded by Transaero's analysis of legislative and international law sources,[17] and because this Circuit and others have already applied Transaero's reasoning in analogous contexts, we apply Transaero to the facts here and inquite "whether the core functions" of the Ministry of the Treasury of Poland "are predominantly governmental or commercial." Transaero, 30 F.3d at 151.
 
 
 62
 b. The Ministry of the Treasury of Poland Is Not an "Agency or Instrumentality"
 
 
 63
 Applying the Transaero standard to the circumstances of this case, the District Court concluded that "[t]he Ministry of the Treasury would appear to be an integral part of Poland's political structure, and its core function—to hold and administer the property of the Polish state—is indisputably governmental." Garb, 207 F.Supp.2d at 35. We agree.
 
 
 64
 The 1997 Constitution of the Republic of Poland provides for a Council of Ministers charged with conducting the Republic's "internal affairs and foreign policy." The Polish Constitution Text and Introduction 86 (R. van der Wolf ed., 2000) (translating Pol. Const. art. 146) ("The Polish Constitution"). One recent study of Poland's government describes the operation of the country's ministers and ministries as follows:
 
 
 65
 Ministers are individually accountable to the Sejm [ie, the lower house of the Polish parliament] for their departmental responsibilities and can face votes of no confidence. Ministers may, but do not have to be, parliamentarians (as in the British case) but if they are they do not have to resign their seats (as in France). They are assisted in running their ministries by secretaries and under-secretaries of state, appointed by the prime minister on their proposal and whose numbers vary according to the ministry. Since 1996, they have been divided into politically nominated figures—who compose their political cabinet who resign along with ministers—and administrative ones who remain, and who are encouraged to behave as civil service functionaries. Administrative structures were standardized in the 1999 reform and ministries all now have the minister's political cabinet along with ten identical organizational units. Ministers can issue orders (zarzadzente) but, unlike prime ministerial regulations, they are only binding internally, within their own ministries.
 
 
 66
 George Sanford, Democratic Government in Poland Constitutional Politics Since 1989, at 164 (2002).[18]
 
 
 67
 Among the functions of the Council of Ministers enumerated in Poland's constitution is the "protect[ion of] the interests of the State Treasury." The Polish Constitution at 86 (translating Pol. Const. art. 146). Defendants have submitted to the District Court a translation of Article 3.2 of Poland's Law of August 8, 1996 on Exercise of State Treasury Powers, which provides that "[t]he State Treasury, represented by the Minister of the State Treasury, is vested with property rights to state-owned assets, unless separate regulations specify that [an]other state legal entity is vested with such rights." J.A. at 235. In addition, defendants supplied an affidavit from Leslaw Kostórkiewicz, a former assistant professor of law at the Warsaw Law School and former Director of the Legal Office of the Polish Senate. See Kostórkiewicz Aff ¶ 2, J.A. at 225. The affidavit states, in relevant part:
 
 
 68
 The Ministry is part of the central government of Poland and exists to act on behalf of the Republic of Poland. By statute, the Ministry manages property, including land, on behalf of the Polish State. It does not hold property separately from the Polish State. The Ministry also represents the Polish State with respect to financial claims brought against the State.
 
 
 69
 Kostorkiewicz Aff. ¶ 16, J.A. at 230.
 
 
 70
 Upon review of this evidence, and the full record before us, we find no error in the District Court's finding that the Ministry of the Treasury of Poland is "an integral part of Poland's political structure" and that the Ministry's "core function is indisputably governmental" rather than commercial. Garb, 207 F.Supp.2d at 35.[19]
 
 
 71
 On appeal, plaintiffs assert that "[t]he District Court's conclusion is clearly at odds with the legislative history of the FSIA," relying principally on two passages from the House Report Appellants' Br. at 55-56. We are not persuaded by plaintiffs' reading of the Report.
 
 
 72
 First, the House Report explains that the requirement that an "agency or instrumentality" be a "separate legal person, is intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." H.R.Rep. No. 94-1487, at 15, reprinted in 1976 U.S.C.C.A.N. at 6614. Plaintiffs argue that the Ministry of the Treasury of Poland falls squarely under this definition because, as Kostorkiewicz's affidavit concedes, the Ministry is "not immune from suit in Poland." Kostórkiewicz Aff. ¶ 4, J.A. at 226.
 
 
 73
 The Transaero Court properly cautioned against reading the Report's passage in the manner suggested by plaintiffs. Because "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself," giving dispositive weight to such powers would extend the definition of "agencies or instrumentalities" "well beyond" the "public commercial enterprises" that Congress apparently intended to target. Transaero, 30 F.3d at 152.
 
 
 74
 Moreover, contrary to plaintiffs' contention, the House Report is, at best, ambiguous on the issue at hand. If the passage invoked by plaintiffs suggests that the Ministry of the Treasury of Poland is an "agency or instrumentality" of the Republic of Poland, other statements in the House Report point in the opposite direction. For example, the passage quoted by plaintiffs is preceded by the following statement:
 
 
 75
 [T]he term "foreign state" as used in every section [of the FSIA besides that codified at 28 U.S.C. § 1608] includes not only the foreign state but also political subdivisions, agencies and instrumentalities of the foreign state.[20] The term "political subdivisions" includes all governmental units beneath the central government, including local governments.
 
 
 76
 H.R.Rep. No. 94-1487, at 15, reprinted in 1976 U.S.C.C.A.N. at 6613 (footnote added). This suggests that all governmental units beneath the central government—and the Ministry of the Treasury is indisputably one such unit—constitute "political subdivisions," a category that is not congruent with "agencies and instrumentalities." Thus, the House Report, read as a whole, offers at best conflicting indications about the Ministry's status.[21]
 
 
 77
 Second, plaintiffs draw out attention to the House Report's statement that "[a]s a general matter, entities which meet the definition of an `agency or instrumentality of a foreign state' could assume a variety of forms, including a department or ministry which acts and is suable in its own name." H.R.Rep. No. 94-1487, at 15-16, reprinted in 1976 U.S.C.C.A.N. at 6614. This passage certainly suggests that a ministry may constitute an "agency or instrumentality" within the meaning of the FSIA, but it by no means indicates that a ministry must constitute an "agency or instrumentality" under that statute.[22] Plaintiffs point to no court that has held that a ministry qualifies as an "agency or instrumentality" under the FSIA, and at least two federal appellate courts have reached the opposite conclusion. See Roeder, 333 F.3d at 234 (holding that, pursuant to the reasoning of Transaero, "the Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent"), Magness, 247 F.3d at 613 n. 7 (holding that "the Russian Ministry of Culture is governed by § 1608(a)," which sets forth requirements for service upon foreign states, "while the Russian State Diamond Fund is a separate legal entity governed by § 1608(b)," which sets forth requirements for service upon agencies or instrumentalities of foreign states).[23] In short, the District Court's reasoning is not contradicted by the legislative history of the FSIA.[24]
 
 
 78
 We therefore hold that the Ministry of the Treasury of Poland is not "an agency or instrumentality" of the Republic of Poland within the meaning of the FSIA. Accordingly, plaintiffs have not satisfied the fourth element of the FSIA "takings" exception to foreign sovereign immunity.
 
 CONCLUSION
 
 79
 For the reasons stated above, we hold that:
 
 
 80
 (1) Altmann requires us to apply the FSIA, and its exceptions, to claims based on conduct that predates the 1976 enactment of the FSIA,
 
 
 81
 (2) plaintiffs have not satisfied the "commercial activity" exception of the FSIA, 28 U.S.C. § 1605(a)(2), because (a) a state's confiscation of property within its borders is not a "commercial" act, (b) the subsequent commercial treatment of expropriated property is not sufficiently "in connection with" the prior expropriation to satisfy the "commercial activity" exception, and (c) we decline to credit plaintiffs' recharacterization of what are in essence "takings" claims as "commercial activity" claims, and
 
 
 82
 (3) plaintiffs have not satisfied the "takings" exception of the FSIA, 28 U.S.C. § 1605(a)(3), because (a) plaintiffs seek to recover property that is not "present in the United States," (b) under such circumstances, plaintiffs must show that the property "is owned or operated by an agency or instrumentality of the foreign state" within the meaning of the FSIA, (c) plaintiffs allege that the property is "owned by" the Ministry of the Treasury of Poland, Appellants' Br. at 15, and (d) the Ministry of the Treasury of Poland is not an "agency or instrumentality" of the Republic of Poland under the FSIA because its "core function" is governmental rather than commercial.
 
 
 83
 Accordingly, we affirm the judgment entered by the District Court granting defendants' motion to dismiss the action for lack of subject matter jurisdiction.
 
 
 
 Notes:
 
 
 [1]
 All references to the "complaint" are to the amended complaint filed March 13, 2000[A 3]
 
 
 [2]
 See also 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter"), Kato v. Ishihara, 360 F.3d 106, 107-08 (2d Cir.2004) (describing the FSIA as codifying a "restrictive theory of sovereign immunity, under which foreign sovereigns enjoy immunity from suit in United States courts, subject to a few, enumerated statutory exceptions") (internal quotation marks and citations omitted).
 
 
 [3]
 28 U.S.C. § 1605(a)(2) provides that:
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state, or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[].
 
 
 [4]
 28 U.S.C. § 1605(a)(3) provides that:
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[].
 
 
 [5]
 TheWhiteman case was decided in a separate opinion issued on November 23, 2005. See Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57 (2d Cir.2005).
 
 
 [6]
 InWhiteman v. Dorotheum GmbH & Co. KG, 431 F.3d at 59 60, 72-74, we held that plaintiffs' claims were nonjusticiable under the political question doctrine, deferring to statements of interest filed by the Government which requested that we dismiss the case in light of the foreign policy interests of the United States. Specifically, we emphasized that the resolution of Whiteman was the sole barrier to the implementation of an executive agreement that had allocated funds for the benefit of Holocaust survivors, and we underscored the urgency of implementing the executive agreement within the lifetimes of as many survivors as possible. Id. at 72-74. Here, where no such circumstances are present, we proceed to address whether plaintiffs have established at least one statutory exception to foreign sovereign immunity pursuant to the FSIA, without evaluating other possible obstacles to plaintiffs' claims, such as the political question or "act of state" doctrines.
 
 
 [7]
 We intend the term "expropriation" to include acts "against individual property" that are carried our "on a wide scale and impersonally" and are "commonly referred to as `nationalization.'"See F.V. Garcia-Amador, Louis B Sohn & R.R. Baxter, Reseat Codification of the Law of State Responsibility for Injuries to Abens 48 (1974).
 
 
 [8]
 28 U.S.C. § 1603(d) defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." In interpreting this provision, the Supreme Court has observed that:
 a state engages in commercial activity under the restrictive theory where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns. Put differently, a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts in the manner of a private player within the market.
 Nelson, 507 U.S. at 360, 113 S.Ct. 1471 (internal quotation marks omitted).
 
 
 [9]
 Nor must we decide whether the Ministry of the Treasury of Poland "own[s] or operate[s]" property that has been taken in violation of international law, or whether the Ministry is "engaged in a commercial activity in the United States."
 
 
 [10]
 Compare 28 U.S.C. § 1610(a)(7) (providing for attachment of "property in the United States of a foreign state used for a commercial activity in the United States regardless of whether the property is or was involved with the act upon which the claim is based" where "the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7)"), with id. § 1610(b)(2) (providing for attachment of "any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States regardless of whether the property is or was involved in the act upon which the claim is based" where "the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), (5), or (7), or 1605(b)").
 
 
 [11]
 The phrase "which is an organ of a foreign state or political subdivision thereof" could carry one of two different meanings (1) "which is an organ of a foreign state or which is a political subdivision of a foreign state," or (2) "which is an organ of a foreign state or an organ of a political subdivision of a foreign state." The House Report on the bill that became the FSIA appears to clarify that the latter is the correct construction. H.R.Rep. No. 94-1487, at 15 (1976),reprinted in 1976 U.S.C.C.A.N. 6604, 6614 ("The second criterion [of 28 U.S.C. § 1603(b)] requires that the entity be either an origin of a foreign state (or of a foreign state's political subdivision) ").
 
 
 [12]
 Moreover, the District of Columbia Circuit has recently reaffirmed the holding ofTransaero TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 300 (D.C.Cir.2005) ("In Transaero we held that for the purpose of determining the proper method of service under the FSIA, an entity that is an `integral part of a foreign state's political structure' is to be treated as the foreign state itself, whereas an entity the structure and core function of which are commercial is to be treated as an `agency or instrumentality' of the state").
 
 
 [13]
 The "case of administration" which theTransaero Court cited as a final rationale for its analytical approach applied particularly to the service of process context, where complex inquiries "may derail cases rather than ensuring their prompt and orderly commencement." Transaero, 30 F.3d at 152.
 
 
 [14]
 Our dissenting colleague asserts that the "core functions" test is "cut from judicial whole cloth," Dissent at [600], and "overnde[s]" the plain language of the FSIA "based on a general, conclusory assertion about the `rich background of federal and international law' against which the FSIA was enacted," Dissent at [601] (quotingTransaero, 30 F.3d at 151).
 Far from relying on a mere "general or conclusory assertion" about the backdrop against which the FSIA was enacted, the Transaero Court established that the undisputed purpose of the FSIA was to codify the "`restrictive' theory of sovereign immunity, under which `immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts.'" Transaero, 30 F.3d at 151 (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 487, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). By interpreting "[t]he distinction between foreign states and their instrumentalities" in light of the "two categories of actors that correspond to the restrictive theory's two categories of acts," id. at 152, the Transaero Court took account of this important historical context, rather than attempting to extract meaning from the FSLA's terms in a vacuum, or engaging in a selective reading of the House Report.
 Our dissenting colleague's suggestion that we may discern a "plain legislative history," Dissent at [603], that definitively resolves the question of how to interpret the phrase "agency of instrumentality" is belied by the recognition of other courts that the House Report is confusing and internally inconsistent, see, e.g., Segni v. Commercial Office of Spain, 650 F.Supp. 1040, 1041 (N.D.Ill.1988) ("The language of the FSIA does not clearly distinguish between a state or political subdivision of a foreign state' and `an agency or instrumentality of a foreign state.' The FSIA defines only the latter phrase, and [t]his definition is not particularly lucid, because it suggests that every `political subdivision' of a foreign state is also an `agency or instrumentality' of that state—which would be inconsistent with [other provisions of the Act]"), and by our colleague's own concession that "both `agencies or instrumentalities' and `political subdivisions' are defined broadly in the FSIA and House Report," Dissent at [599]. Indeed, it was precisely because the Transaero Court concluded that "[t]he words [of the statute] in themselves are opaque" and that the House "Report is at odds with itself" that it turned to the "rich background of federal and international law" to "color[] the statutory terms and fill[] them out." Transaero, 30 F.3d at 151-52.
 Because we agree with the Transaero Court that any attempt to extract a literal reading of what is, in the final analysis, an ambiguous statutory provision, will simply have courts running in circles, we conclude that the "core functions" test is the most effective way to remain faithful to Congress's intent in enacting the takings exception to sovereign immunity.
 
 
 [15]
 InCompagnie Noga, we also remarked upon certain parallels between sovereign immunity under the FSIA and well-settled principles of Eleventh Amendment immunity:
 [In Transaero], the United States took the view that if a "judgment would essentially be one against the state and an entity's assets are not separate from those of the state, then the entity is not a legal person separate from the state even if, in a formalistic sense, that entity can enter into contracts in its own name, and sue or be sued in its own name." The legal standard articulated in the Transaero amicus brief [of the United States] is the same standard that has been adopted by the Supreme Court in determining whether an agency or instrumentality of a state is entitled to Eleventh Amendment Immunity.
 Compagnie Noga, 361 F.3d at 688 (quoting Brief of Amicus Curiae United States at 17, Transaero (No. 92-7222), quoted is Garb, 207 F.Supp.2d at 37).
 We note that, in this appeal, the United States "continue[s] to adhere to the view articulated in the United States' amicus brief in Transaero." United States Supplemental Letter at 10.
 
 
 [16]
 According to a recent decision in the District Court for the District of Columbia, the holding inRoeder "indicates that the categorical approach in analyzing the § 1603 distinction between the foreign state and an `agency or instrumentality' of the foreign state applies to FSIA contexts other than the service-of-process provision at issue in Transaero" Dammarell v. Islamic Republic of Iran ("Dammarell I"), 281 F.Supp.2d 105, 200-01 (D.D.C.2003), vacated on other grounds, Dammarell v. Islamic Republic of Iran ("Dammarell IV"), 404 F.Supp.2d 261 (D.D.C.2005) ("This Court previously concluded that the [Iranian] MOIS does nor fall within the statutory definition of an `agency of instrumentality,' see Dammarell I, 281 F.Supp.2d at 200-02, and it hereby reaffirms that conclusion. See also Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C.Cir.2003) (Iran's Ministry of Foreign Affairs `must be treated as the state of Iran itself rather than as its agent') ").
 
 
 [17]
 Our dissenting colleague insists thatTransaero's dichotomy between commercial and governmental activities is "inapt, particularly for § 1605(a)(3), which applies to the sovereign act of expropriating property in violation of international law." See Dissent at [602]. Inasmuch as § 1605(a)(3) specifies conditions under which "foreign state[s]" may be liable for takings, it is true that not all "inherently sovereign or public acts," see Transaero, 30 F.3d at 151-52, are immune from suit. Nonetheless, the mere fact that foreign states may, in certain circumstances, be held liable does not undermine the force of the Transaero Court's observation that, throughout the FSIA, Congress distinguished between acts undertaken by entities in a governmental capacity and those undertaken in a commercial capacity. Cf. Dissent at [601] ("In [drafting § 1605(a)(3)], Congress apparently rejected a neat categorical distinction between when a sovereign acts in a private capacity and when it acts in a public capacity"). Indeed, the language of § 1605(a)(3) specifies that while "foreign state[s]" are not immune from "takings" suits when the property to question is "present in the United States," the threshold for bringing such suits against "agenc[ies] or instrumentalit[ies]" of a state is considerably lower the FSIA requires only that property be "owned or operated" by the agency or instrumentality and that the agency or instrumentality be "engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). We may reasonably infer that had Congress understood "agency or instrumentality of a foreign state" to refer to entities that are inseparable from the "foreign state" itself, it would not have established separate standards of proof that plaintiffs must satisfy in order to bring a "takings" claim pursuant to § 1605(a)(3).
 
 
 [18]
 Although neither Poland's constitution nor the work of Dr. Sanford (who is Reader in Politics at the University of Bristol) are included in the record of thus case, both are appropriate for judicial notice, which "may be taken at any stage of the proceeding." Fed. R. Evid 201(f). Under Federal Rule of Evidence 201(b)(2), "[a] judicially noticed fact must be one nor subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." We have previously taken judicial notice of "authoritative text[s,]" such as a book setting forth the "history of Lincoln Center."See Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Rec., 311 F.3d 534, 540 n. 1 (2d Cir.2002) (citing Flood v. Kuhn, 407 U.S. 258, 260-62, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (taking judicial notice of various authoritative books on baseball)).
 
 
 [19]
 Indeed, it may be that, apart from the departments of government charged with national defense and public order,no department of government is more essential to the daily functioning and long term survival of that government than its treasury. See generally. The Federalist No. 30, at 188 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Money is considered as the vital principle of the body politic, as that which sustains its life and motion and enables it to perform its most essential functions. A complete power, therefore, to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution."). It is thus not surprising that, in the history of our own Republic, the first four departments of the Executive to be created were State, Treasury, War, and Justice. In Poland, where the Ministry of the Treasury also holds property in the name of the sovereign state, the central importance of that political subdivision is even more pronounced.
 
 
 [20]
 It be its repeating that, while the "foreign state" includes all its "agencies and instrumentalities" for the purposes of the "takings" exception, 28 U.S.C. § 1603(a), not every organ of the foreign state constitutes an "agency or instrumentality" within the meaning of 28 U.S.C. § 1603(b). In order to meet the second clause of the fourth element of the takings exception, plaintiffs must show not merely that the Ministry of the Treasury of Poland is part of a "foreign state," but that the Ministry has the characteristics of an "agency or instrumentality." 28 U.S.C. § 1605(a)(3)
 
 
 [21]
 Our dissenting colleague attempts to minimize the internal inconsistencies within the House Report by interpreting the phrase "political subdivisions" as referring "not to various central state entities, but rather to different geographical levels of government, such as national, regional, provincial, state, and local governments." Dissent, at [601-602] n.4. Such an interpretation is flawed for several reasons. First, it squarely contradicts existing case law holding that departments or ministries of a central government qualify as "political subdivisions of a foreign state" under FNIASee, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 618 n. 5, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (endorsing the lower court's conclusion that, for FSIA purposes, "`the [Cuban] Ministry of Foreign Trade is no different than the Government [of Cuba] of which its minister is a member'") (quoting Banco Nacional De Cuba v. Chase Manhattan Bank, 505 F.Supp. 412, 425 (S.D.N.Y.1980)), Magness v. Russian Fed'n, 247 F.3d 609, 613 n. 7 (5th Cir.2001) (characterizing Russian Ministry of Culture as a political subdivision of Russia for purposes of FSIA's service of process provision), S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1298 (11th Cir.2000) (characterizing Yemens Ministry of Supply & Trade as a political subdivision of Yemen), see also O'Connell Mach. Co. v. M.V. "Americana," 734 F.2d 115, 116-17 (2d Cir.1984) (holding that a public financial entity which coordinates the management of the commercial enterprises of the Italian Government is a political subdivision for FSIA purposes).
 Second, even assuming arguendo that scattered excerpts of the Restatement (Third) of the Foreign Relations Law of the United States ("Restatement") constituted an authoritative source for construing the meaning of a particular phrase as used in the FSIA, our colleague fails to account for those portions of the Restatement in which the phrase "political subdivision" plainly does nor refer exclusively to local units of government. See Restatement § 207 cmt c ("[State] responsibility [under international law] extends also to action or inaction by local officials or officials of political subdivisions") (emphases added).
 Third and finally, the mere fact that, as used in the FSIA, "[t]he term `political subdivisions' includes all governmental units beneath the central government," H.R.Rep. No. 94-1487, at 15, reprinted in 1976 U.S.C.C.A.N. at 6613 (emphasis added), does not imply that the only political subdivisions subsumed within the FSIA's definition of a "foreign state" are units of local government. Indeed, to adopt such an interpretation would require us to assume that Congress intended to bring municipal governments within the definition of a "foreign state" while simultaneously excluding an entity such as the Ministry of the Treasury of Poland, which holds and administers the land, property, and finances of the Polish state.
 
 
 [22]
 Although our dissenting colleague objects that our analysis "conflicts with the House Report[]" inasmuch as—in his view—"all ministries would seem, by definition, to be governmental rather than commercial in their core functions," Dissent at [600-601], we make no such categorical statement. Indeed, the very purpose of the "core functions" test is to look beyond mere labels to discern whether an entity is actually engaged in predominantly governmental activity or whether its primary functions are instead commercial.
 
 
 [23]
 The conclusion that the Ministry of the Treasury of Poland is to be treated the same as the Republic of Poland for the purposes of foreign sovereign immunity is also supported by the analogy between foreign sovereign immunity and Eleventh Amendment immunitySee ante, at [592-593 n. 15]. As we explained in Compagnie Noga, "it is black letter Eleventh Amendment law that the political agencies and departments of states are entitled to the same sovereign immunity as the state." 361 F.3d at 688 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and Jones v. N.Y. State Div. of Military & Naval Affairs, 166 F.3d 45, 49 (2d Cir.1999)).
 
 
 [24]
 By placing determinative weight on three characteristics of a public entity—namely, whether it "can sue and be sued in its own name, contract in its own name or hold property in its own name," Dissent, at [600] (quotingHyatt Corp. v. Stanton, 945 F.Supp. 675, 681 (S.D.N.Y.1996))—our colleague would permit a far greater range of suits against state sovereigns than Congress intended when it codified the "restrictive theory" of sovereign immunity in the FSIA. See ante, at [585 & nn. 2 & 14]. In light of "the seriousness of the events alleged in Garb's complaint," our colleague urges us to look past the "legally unsupported technicality" that the Ministry of the Treasury of Poland is part and parcel of the Republic of Poland. See Dissent at [598]. Regardless of the nature of a plaintiff's claim, however, we are bound to apply the doctrine of state sovereign immunity, which itself protects important principles, not the least of which is that, except when a small number of special circumstances prevail, sovereign states are granted immunity from suit in the courts of other sovereign states—a reciprocal norm that significantly insulates the United States from suits in foreign countries.
 
 
 
 84
 STRAUB, Circuit Judge, dissenting.
 
 
 85
 Garb et al's ("Garb") complaint describes a campaign of ethnic cleansing waged in the aftermath of World War II against Poland's Jewish Holocaust survivors. Specifically, Garb alleges that Poland's newly-formed nationalist government expropriated Jewish property — including homes, businesses and community centers — through violence, intimidation, and murder as part of its efforts to create an ethnically homogeneous state by inducing hundreds of thousands of Jews to flee the country. The Foreign Sovereign Immunity Act ("FSIA") affords a cause of action for such violations of international law under certain conditions. The property at issue must be present in the United States or be owned or operated by a state "agency or instrumentality" that "is engaged in commercial activity in the United States." 28 U.S.C. § 1605(a)(3).
 
 
 86
 The majority dismisses Garb's complaint based on a narrow reading of the term "agency or instrumentality" that excludes the Polish Ministry of the Treasury ("Treasury") without any jurisdictional discovery. This reading is contrary to the language and the legislative history of the FSIA, and thus arbitrarily eliminates the right of victims such as Garb to seek compensation for what was done to them and to their ancestors. Because I find that we may (depending on facts that the District Court failed to develop) have jurisdiction under the FSIA to hear Garb's claims, I respectfully dissent.[1]
 
 DISCUSSION
 I. Subsection 1605(a)(3)
 
 87
 The provision at issue here abrogates immunity in all cases:
 
 
 88
 in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.
 
 
 89
 28 U.S.C. § 1605(a)(3). As the majority explains, whether this subsection applies to the Treasury depends on whether, under the FSIA, the Treasury is an agency or instrumentality of Poland or is a political subdivision or the Polish state itself.
 
 
 90
 The FSIA defines "agency or instrumentality" broadly, as "any entity — (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." Id. § 1603(b) (emphasis added).[2] The House Report on the FSIA ("House Report") explains that any state entity is a "separate legal person," and therefore an "agency or instrumentality," provided that "under the law of the foreign state where it was created, [it] can sue or be sued in its own name, contract in its own name or hold property in its own name." H.R.Rep. No. 94-1487, at 15 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614 (emphasis added). The House report further explains that:
 
 
 91
 As a general matter, entities which meet the definition of an `agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.
 
 
 92
 Id. at 15-16 (emphasis added). Thus, reading the statute alongside the House Report, departments or ministries would appear to be "agenc[ies] or instrumentalit[ies]" if, under that country's own laws, they are treated separately from the state for purposes of litigation, contract or property law. As for the term "political subdivision," the House Report explains that this term "includes all governmental units beneath the central government, including local governments." Id. at 15. If an entity is a political subdivision, it cannot be sued unless it is engaged here in commercial business that involves the property at issue. 28 U.S.C. § 1605(a)(3).
 
 
 93
 Because both "agencies or instrumentalities" and "political subdivisions" are defined broadly in the FSIA and House Report, the line between the two categories is not absolutely clear. As a result, courts have formulated two conflicting tests for distinguishing between them the "legal characteristics" test, which focuses on whether the entity is legally separate from the state in a number of ways, and the "categorical" or "core functions" test, which focuses on whether the core functions of the entity are primarily governmental or commercial. Compare Hyatt Corp. v. Stanton, 945 F.Supp. 675, 683-84 (S.D.N.Y.1996) (holding that a governmental unit is an agency or instrumentality as long as it can act and be sued in its own name), and Bowers v. Transportes Navieros Ecuadorianos (Transnave), 719 F.Supp. 166, 170 (S.D.N.Y.1989) (applying legal characteristics test), with Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 155 (D.C.Cir.1994) (finding the core functions test more compatible with the legal background to the FSIA), cert. denied, 513 U.S. 1150, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995).
 
 
 94
 The majority chooses the narrower core functions test, holding that any government entity whose core functions are governmental rather than commercial is by definition a political subdivision rather than an agency or instrumentality. Ante at [594]. The principal flaw in this reading of the FSIA is that it finds no support in the statute's definition of "agency and instrumentality," which turns on whether an entity is a "separate legal person" rather than on its functions. 28 U.S.C. § 1603(b)(1). The legal characteristics test is plainly designed to identify whether an entity is a "separate legal person," and it derives directly from specific language in the House Report. See House Report, at 15 (stating that an entity is a separate legal entity if it "can sue and be sued in its own name, contract in its own name or hold property in its own name"), Hyatt, 945 F.Supp. at 681 (describing legal characteristics test as focusing on precisely those three factors).
 
 
 95
 The majority's core functions test, on the other hand, is cut from judicial whole cloth. There is nothing in the statute or legislative history that makes commercial activity "the ultimate touchstone for FSIA analysis" in all respects. Transaero, 30 F.3d at 156 (Mikva, J., dissenting), see also id. at 155 (explaining that majority's distinction between governmental and commercial functions "is nowhere to be found in the statute or legislative history"). Given that the FSIA is permeated elsewhere by explicit distinctions between commercial and non-commercial activities, see, e.g., § 1605(a)(2) (abrogating immunity for certain commercial activities), it is telling that the FSIA makes no such distinction based on a defendant's core functions. See Hyatt Corp., 945 F.Supp. at 684 (noting that the FSIA's explicit distinction between commercial and non-commercial activities suggests that, had Congress intended also to distinguish between state commercial entities and state governmental entities, it would have done so in similarly explicit terms).
 
 
 96
 Indeed, the majority's view conflicts with the House Report's statement that an agency or instrumentality could assume the form of "a department or ministry which acts and is suable in its own name," House Report at 16, since all ministries would seem, by definition, to be governmental rather than commercial in their "core functions." The majority attempts to explain away this inconsistency by arguing that, simply because a ministry "could" be an agency or instrumentality, it does not follow that it must be such. Of course, "could" does not mean "must", but "could" cannot mean "could not," as the majority would have it. The only possible reading of the House Report is that whatever test the courts devise, this test must allow for the possibility that at least same state ministries will fall within the FSIA's definition of "agency or instrumentality."
 
 
 97
 The legal characteristics test, by contrast, fully comports with the House Report because it enables courts to distinguish between ministries, classifying those with an independent legal character as agencies or instrumentalities. See Hyatt Corp., 945 F.Supp. at 683-84 (rejecting a proposed "core function" test as contrary to the text and legislative history of the FSIA, and citing cases where, under the legal characteristics test, a governmental entity was found not to be a separate legal entity), see also Transaero, 30 F.3d at 155 (Mikva, J., dissenting) ("[E]very foreign entity starts out on the same footing, and a court must decide whether the particular entity is a separate legal person — that is, whether it acts and is suable in its own name" (quotation marks omitted)).
 
 
 98
 The majority's reading also undercuts the very existence of § 1605(a)(3). See Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant" (internal quotation marks omitted)). Having already abrogated immunity for state commercial activities under § 1605(a)(2), Congress added subsection (a)(3) to address illegal expropriations, even though expropriations are a "decidedly sovereign — rather than commercial — activity," ante at [586]. In so doing, Congress apparently rejected a neat categorical distinction between when a sovereign acts in a private capacity and when it acts in a public capacity. This choice should not be overridden simply based on a general, conclusory assertion about the "`rich background of federal and international law'" against which the FSIA was enacted. Ante at [591] (quoting Transaero, 30 F.3d at 151).[3] Certainly, Congress's policy decision undermines the majority's conclusory view that Congress intended to codify any rigid distinction between "public" acts and "commercial" acts.
 
 
 99
 To overcome these statutory obstacles, the majority relies on the House Report's definition of "political subdivision" as "includ[ing] all governmental units beneath the central government, including local governments." Ante at [596] (citing House Report at 15). The majority construes the House Report language as sweeping in all administrative ministries, departments, and the like. However, the House Report language relating to political subdivisions is far vaguer than the language clarifying the FSIA's definition of "agency or instrumentality," offers less evidence of specific congressional intent, and therefore cannot be given the same weight.[4] See Morales v. Trans. World Airlines, Inc., 504 U.S. 374, 384-85, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general"), Mattel, Inc. v. Barbie-Club com, 310 F.3d 293, 300 (2d Cir.2002) (applying the canon of generalia specialibus non derogant, according to which general provisions do not qualify specific ones).
 
 
 100
 For these reasons, statutory considerations, on balance, weigh heavily in favor of applying the legal characteristics test, rather than the majority's "core functions" test, to determine whether the Polish Treasury is a political subdivision of Poland or an agency or instrumentality.
 
 II. Caselaw
 
 101
 Notwithstanding the statutory obstacles discussed above, the majority herein is "persuaded by" the majority's analysis in Transaero to reject Garb's literal reading of the FSIA. See ante at [594]. I am not. To begin with, the circumstances in Transaero were different from those here in at least one crucial respect the D.C. Circuit was merely deciding whether service had been properly effected (a question which depended on the defendant's status under the FSIA), not whether an entire class of defendants was immune under § 1605(a)(3). Indeed, one of the reasons given by the Transaero majority for its categorical "core functions" test was that "[s]ervice of process should be the prologue to the suit rather than the central drama," and that an unnecessarily complex test would "derail cases rather than ensuring their prompt and orderly commencement." Transaero, 30 F.3d at 152. Plainly, these same efficiency concerns cannot apply where, as here, classification of the defendant will decide not merely the preliminaries of litigation but the merits themselves.
 
 
 102
 As for the persuasiveness of Transaero's remaining analysis, the Transaero majority relied on three additional grounds of doubtful validity or significance. First, the Transaero majority presumed that, because FSIA generally codified a "restrictive" theory of sovereign immunity, an "agency or instrumentality" must be a commercial, as opposed to a public enterprise. See Transaero, 30 F.3d at 151-52. As the Transaero dissent explained, however, this "distinction is nowhere to be found in the statute or legislative history." Id. at 155 (Mikva, dissenting). Indeed, the dichotomy seems "inapt," id., particularly for § 1605(a)(3), which applies to the sovereign act of expropriating property in violation of international law, and which undermines the Transaero majority's blanket assertion that FSIA "repealed sovereign immunity for `commercial activities,' but preserved it for inherently sovereign or public acts." 30 F.3d at 151-52.
 
 
 103
 Second, the Transaero majority also relied on the fact FSIA allows venues in suits against agencies or instrumentalities wherever they are licensed to do business or are doing business Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 152 (D.C.Cir.1994) (citing 28 U.S.C. § 1391(f)(3)). However, as the Transaero dissent points out, see id. at 155, this provision is only one of various alternative methods for establishing venue, and therefore does not suggest that all agencies or instrumentalities will have a place of business. Third, the Transaero majority relied on the fact that the phrase "agency or instrumentality" is a "commonplace" in government corporate charters. But it is a textbook logical fallacy to infer, from the fact that all corporations are called "agencies or instrumentalities," that all agencies or instrumentalities are corporate. More importantly, the Transaero majority improperly overrode the FSIA's plain legislative history in favor of a conclusory assumption that Congress simply could not have intended to sweep in as many state defendants as would be swept in on a literal reading of "agency or instrumentality."
 
 
 104
 The majority also relies on the fact that Transaero was cited in two subsequent cases. Magness v. Russian Federation, 247 F.3d 609 (5th Cir.), cert. denied, 534 U.S. 892, 122 S.Ct. 209, 151 L.Ed.2d 149 (2001) and Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation, 361 F.3d 676, 683 (2d Cir. 2004). These cases provide little support for the majority's conclusion, and certainly do not support a result contrary to or in tension with the statute. Magness did not decide the present issue at all, but simply noted that both parties accepted the Russian Ministry of Culture's status as a political subdivision for purposes of determining service, then, in passing dicta, it appeared (oddly enough) to endorse both Transaero's "core functions" test and Hyatt's "legal characteristics" test. Magness, 247 F.3d at 613 n. 7 (citing Transaero, 30 F.3d at 151 and Hyatt Corp. v. Stanton, 945 F.Supp. 675, 683 (S.D.N.Y. 1996)).
 
 
 105
 Similarly, the rather narrow issue before us in Compagnie Noga was whether the Russian Federation could be held to an arbitration agreement entered into by the Russian Government. We found that, under the Constitution of the Russian Federation, the Russian Government constituted one half of a bicameral executive, and functioned analogously to our executive cabinet. 361 F.3d at 685-86. We also noted that the Russian Government had presented no evidence that it was an independent juridical entity from the Federation. Compagnie Noga, 361 F.3d at 686. In these circumstances, we determined that the Russian Government had not provided a basis for escaping the arbitration agreement. Because Compagnie Noga did not concern the FSIA or any other statutory references to agencies, instrumentalities or political subdivision and did not involve any substantiated claim by the defendant that it was legally independent from the Russian Federation, the case is scarcely relevant to, and certainly not controlling of, the case at hand.
 
 CONCLUSION
 
 106
 As set forth above, the majority's reading is in tension with the text of the FSIA, conflicts with the House Report's clear, specific definition of "agency or instrumentality," and places undue weight on the House Report's vague definition of "political subdivision." The majority's strained reading of the FSIA, moreover, is unnecessary. The FSIA's distinction between "political subdivisions" and "agencies or instrumentalities" makes sense if the dividing line is between government entities with a separate legal existence—i.e., possessing their own budget, suable in their own name, etc.—and those without such.
 
 
 107
 Because this case was dismissed before any jurisdictional discovery took place, and because the record therefore does not clearly indicate how Garb would fare on the legal characteristics test, this case should be remanded for further proceedings. It is important, as well, to bear in mind the seriousness of the events alleged in Garb's complaint, which I think merits something more than dismissal based on a legally unsupported technicality. I therefore respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Because I would remand for jurisdictional discovery as to the applicability of § 1605(a)(3), I do not reach Garb's alternative argument that Poland's actions fall within the "commercial activity" exception to the FSIA,see § 1605(a)(2).
 
 
 [2]
 There is a third condition, which is irrelevant. The majority concedes that the first prong of this statutory definition is the only one at issue in this caseSee ante at [590].
 
 
 [3]
 Similarly, the majority's analogy to Eleventh Amendment immunity,see ante at [597] n. 23, is inapt. While "it is black letter Eleventh Amendment law that the political agencies and departments of states are entitled to the same sovereign immunity as the state," Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation, 361 F.3d 676, 688 (2d Cir.2004), the House Report makes plain that the FSIA allows for jurisdiction over at least some ministries as the majority appears to concede, see ante at 597 n. 22. See also College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 685, 119 S.Ct. 2219, 144 L.Ed.2d 605 ("[A] suit by an individual against an unconsenting State is the very evil at which the Eleventh Amendment is directed-and it exists whether or not the State is acting for profit, in a traditionally `private' enterprise, and as a `marker participant.'"), id. n. 4 (rejecting proposed analogy between Eleventh Amendment and FSIA).
 
 
 [4]
 Further complicating the meaning of "political subdivision" is the fact that this term is often used to refer not to various central state entities, but rather to different geographical levels of government, such as national, regional, provincial, state and local governmentsSee Restatement (Third) of the Foreign Relations Law of the United States ("Restatement") § 452 comment b (emphasis added) ("Immunity of political subdivisions. Under international law, cities, towns, counties, and comparable subordinate units of government ordinarily are not entitled to sovereign immunity. The immunity of constituent units of federal states — e.g. provinces, cantons, States — is disputed The States of the United States enjoy immunity in United States courts under the Constitution), id at Reporters' Note 1 ("Immunity of foreign political subdivisions in United States courts Cities and towns of foreign states have not generally been considered immune However, political subdivisions that have a status comparable to that of States of the United States have been held immune as sovereigns" (internal citation omitted)), id. § 901, comment b ("A state may seek redress under international law for any violation of its legal interests, including those concerning its political subdivisions (States, provinces, cantons, or regions), public corporations, or private persons).